BLANCHARD *& al.* plaintiffs in error, vs. BAKER *& al.* original plaintiffs.

The right to use the water of a stream for domestic purposes, watering cattle, and irrigation, is to be so exercised as not essentially to diminish, or unreasonably to detain the water. And the right of using it for this latter purpose will not justify the taking of water for other purposes, to the injury of other proprietors.

Where the proprietors of a mill privilege and bank of a river obtained license from the owner of the opposite bank to extend their dam across the stream and join it to his own land, till he should want the privilege on his side the stream for his own use ; it was held that the subsequent revocation of this license could not affect the right of the proprietors to the head of water thus raised and appropriated.

In an action of the case for diverting a water-course, if the unlawful diversion be proved, the plaintiff is entitled to recover, without proof of actual damage.

Whether aquatic rights are acquired by mere prior occupancy, not continued for twenty years ;—*quære.*

The owner of an ancient mill may change the character and use of his mill, at pleasure, without impairing his right to the water ; if he does not thereby injure his neighbor's mill, and returns the water again to its ancient channel.

One tenant in common may have an action of trespass on the case against his co tenant, for diverting the water from their common mill, for separate purposes of his own.

THIS was a writ of error, brought to reverse a judgment rendered by *Whitman C. J.* in the court below. The action was trespass on the case, brought originally before a Justice of the peace, by *Jeremiah Baker* and *Samuel Baker*, against *Sylvanus Blanchard, Amasa Baker*, and *Benjamin Mitchell*, for diverting the water of *Royall's* river from their mill. The declaration was as follows :—"for that the plaintiffs, on the thirtieth day of *April, A. D.* 1830, were, and ever since have been, and now are seised of thirteen sixteenths of a certain ancient water-mill, called a corn or grist mill, with an ancient mill-dam and privilege appurtenant thereto, situate in *North Yarmouth*, commonly called and known by the name of *Baker's* mill, in their own demesne as of fee, as tenants

in common with the said *Sylvanus, Amasa* and *Benjamin ;* and the plaintiffs and all those whose estate they now have in the said mill with the appurtenances, in common, or with the owners of the remaining three sixteenths, have ever had, and now ought to have the whole of a certain stream or water course, called and known by the name of *Royall's* river, running to the said mill, for the benefit thereof, as ancient rights and privileges appertaining to the said mill. But the said *Sylvanus, Amasa* and *Benjamin,* well knowing the premises, but intending to injure the plaintiffs, and deprive them of their part of the use and profits of said mill, did on the said thirtieth day of *April,* and on divers other days and times between that, and the day of the purchase of this writ, dig up and remove the banks of said river and water course, above said mill, and open a wide and deep channel from said river, and thereby divert a great part thereof so running as aforesaid from the said mill, so that the said mill, which before was able and was used to grind twenty three bushels of corn and grain in every hour, now and during the time aforesaid, by reason of the diversion aforesaid of the said water, is and has been able to grind only nine bushels of corn and grain in every hour ; by reason of which the plaintiffs have been deprived of a great part of the profits of their share of said mill, and still continue to be deprived thereof.

Also, for that whereas the said *Sylvanus, Amasa* and *Benjamin,* at said *North Yarmouth,* on the first day of *June,* in the year of our Lord eighteen hundred and twenty eight, intending to injure the owners of said mill, and mill privilege, and those who should thereafter become owners thereof, and deprive them of the water running to and by the same, had on that day, and on divers other days between that and the fifth day of *August,* in the year last aforesaid, dug up and opened a channel above said mill privilege and thereby diverted a great part of the water running as aforesaid, from the said mill privilege ; the said defendants thereafter, to wit, from the twenty seventh day of *April,* now last past, until the day of the purchase of this writ, continued the said channel open, and deepened the same, and thereby diverted a great part of the water from said mill and mill privilege and greatly injured the same.

The following is the substance of the bill of exceptions which was filed by the original defendants, in the case.

*Samuel Baker,* with his three sons, *Nathaniel, Amasa* and *Samuel,* in 1796, built a single grist-mill, which was the first mill, upon the premises in question, on the west side of *Royall's* river. It was built upon the privilege, of which said *Samuel* the father and his three sons commenced an occupation ; and the father had before used the land adjoining for a pasture, but without any title to the same. *Samuel Baker* the father died seised of one quarter part of the premises in question on the west side of said river, in 1801. He left nine children, one of whom died, before any of the conveyances hereafter mentioned, were executed ; and that without issue. The children, by bond, dated 17th *Nov.* 1801, agreed to settle their father's estate, "among themselves," without administration ; "to make provision for their mother," to depute some person to pay all "debts due from said estate, and all the remainder to make partition of among themselves in the most just and equal manner that could be done."

The plaintiffs, to prove their title as set forth, produced the deed of *Nathaniel* and *Amasa Baker* to *Ammi R. Mitchell,* dated 25th *August,* 1807, and recorded on the following day ; conveying "one half of a grist-mill standing on the falls in *Royall's* river in *North Yarmouth* aforesaid known by the name of *Baker's* falls, together with one half of all the privilege belonging to said mill, and one third of a card machine standing on the same falls, together with one third part of all the privilege belonging to said machine. Also, five eights of a nail mill or machine, together with a blacksmith's shop and tools, standing on the aforesaid falls, together with all the privilege belonging to said iron works or machines, together with a privilege of the road leading from the county road to said mills and privilege :"—A deed of the same premises from said *Ammi R. Mitchell* to *Joseph Sturdivant, Ephraim Sturdivant* and *Andrew Blanchard,* dated 3d *Sept.* 1808, and recorded 6th *Sept.* 1808 :— and of the said *Sturdivants* and *Blanchard* to *Jeremiah Baker,* one of the plaintiffs, dated 28th *April* 1826, and recorded 4th *May* 1826.

They also produced the deed of *Samuel Baker*, son of *Samuel Baker*, deceased, and father of *Jeremiah*, dated 8th *April*, 1816, and recorded 10th *June*, 1818, conveying to *Jeremiah*, among other property therein recited, "one quarter of the grist mill; three undivided eighth parts of the nail mill and machine; three eighth parts of the blacksmith shop and tools; which I purchased of Hon. *Ammi R. Mitchell*, and two thirds of the carding machine; all standing on *Baker's* falls; together with the privileges belonging to the several parts of mills, shops and machines aforesaid :"—Also the deed of *Solomon Winslow* and wife to said *Jeremiah*, dated 8th *May*, 1826, and recorded 28th *Feb.* 1827, conveying to him "one eighth part of the real estate which was assigned to the said *Eleanor*," widow of *Samuel Baker* the ancestor, "as aforesaid, and which at her demise reverted to her heirs and the heirs of the said *Samuel Baker*, deceased." The plaintiffs further offered in evidence a deed of quit-claim from *Joseph M. Baker* to *Jeremiah Baker*, one of the plaintiffs, dated *Dec.* 10, 1827, conveying one thirty second part of *Baker's* mill and privilege : also a warranty deed from the plaintiff, *Jeremiah Baker*, to the plaintiff, *Samuel Baker*, dated *April* 27, 1830, conveying one fourth part of the same mill and privilege. It was proved that by an agreement among the heirs of said *Samuel* deceased, one fourth of the mill and privileges appurtenant, was assigned to the widow of said *Samuel* deceased, as, and for her dower in his estate. The defendants contended that upon the true construction of the deeds introduced by the plaintiffs, no title to the privileges therein mentioned, passed from the several grantors, farther than such title as they could claim as heirs of *Samuel Baker ;* and that as there were eight heirs, the plaintiff had established title to no more of the privileges before mentioned, than the three eights and one thirty second, under the respective deeds of *Samuel Baker*, *Nathaniel* and *Amasa Baker*, and *Solomon Winslow* and wife.

But the Court ruled that the plaintiffs had proved their title to thirteen sixteenths of the mill, dam and appurtenances, and of the water-course, or stream, as set forth in their declaration.

In defence, the defendants offered in evidence the quitclaim deed of *Josiah Lovell* and wife, *Sarah Baker* and *Hannah Baker*, children and heirs of *Samuel Baker*, conveying to *Amasa Baker*, one of the defendants, all their right, title and interest in and to one " fourth part of a grist mill and mill privilege situate in said *North-Yarmouth*."  " Also all other estate of said *Samuel Baker* deceased, of which he died seised and possessed, and which we, as his heirs, have not heretofore disposed of by deed or otherwise."  This deed was dated 9th *January*, 1824, duly acknowledged, and recorded 14th *September*, 1827.  Also the deed of quitclaim of *Nathaniel Baker*, *Solomon Winslow* and *Catharine* his wife, and *Josiah Lovell* and *Jane* his wife, children and heirs of said *Samuel Baker*, to said *Amasa Baker*, dated 19th *February*, 1827, duly acknowledged and recorded 14th *September*, 1827, conveying to said *Amasa*, all their right, title and interest in and to one fourth part of the grist-mill and privilege called *Baker's* mills."  This, with the property mentioned, was described as " having been assigned to our late mother *Eleanor Baker*, as dower.  Also, all other real estate of said *Samuel Baker*, deceased, which has not been divided among the heirs."

The defendants further offered in evidence the warranty deed of *Amasa Baker*, one of the defendants, to *Sylvanus Blanchard*, and *Benjamin Mitchell*, co-defendants, dated 6th *September*, 1827, conveying to them " one eighth part of the mill privilege in *Royalls'* river in said *North-Yarmouth*, known by the name of *Baker's* mill's," in common with the other seven eighths of said privilege— " together with a privilege of the aforesaid road" (meaning the mill road) " to pass and repass to said privilege ;—also, one undivided half of another piece of land" on the south-east side of said road, and adjoining the mill privilege.  " Also, one undivided half of another piece of land," on the north-west side of the road, and adjoining the mill privilege.  Under the above recited deeds, the defendants, upon the construction above contended for, claimed title to four eighths of the premises in question, on the west side of the river.  It was proved that *Samuel Baker* the elder, occupied and fenced the land adjacent to the river, adjoining the mill privilege, and that

33

no one but himself ever claimed the same during his life, except that his three sons claimed as before mentioned the three quarters of the mill and privileges appurtenant, and occupied the same.

The defendants also proved their title to the premises, on the east side of *Royalls'* river, upon which the diversion of the water is alleged to have been made, through the heirs of *David Jones*, who was shown by the witnesses, to have been in open possession of the same for upwards of thirty years before his death, which was in 1821, occupying and fencing the same to the river. In their deeds from *Jacob H. Jones*, son of *David*, the estate conveyed is bounded on a line running " to the river; thence down the river, as it treads, to a stake," &c. These deeds are from *Jacob H. Jones* to *Amasa Baker*, *Sylvanus Blanchard* and *Benjamin Mitchell*, the one dated *August* 17, 1827, duly acknowledged and recorded *October* 31, 1827—the other dated *November* 1, 1827, duly acknowledged and recorded *November* 6, 1827.

It was also proved that Dr. *Jones*, thirty years ago, told *Nathaniel Baker*, that the owners of the mill on the west side of the river might join their dam on the east side of the main stream, until such time as he should want the privilege there ; and that before the plaintiffs had built their new dam, the defendants forbade such building or joining of it upon the land on the east side.

In relation to the channel or outlet, through which the defendants conduct water to drive their mill, it was proved that the water had passed through it in greater or less quantities for thirty-five or forty years, when the water was high ;—that the plaintiffs' present dam is eight inches higher than the former dam was ;—that the water did not run in the defendants' channel, before it was deepened, unless the water was several inches higher than the old dam ; that the defendants have since lowered or deepened their channel two and an half feet ; so that when the water runs over the plaintiffs' present dam, there will be a depth of water in defendants' channel of three and an half feet. The water always trickled through the rocks at the entrance of the channel. They also proved that after the defendants had deepened their channel, they were obliged to dam it

up while they were laying the foundation of their mill, owing to the flow of water, which was such as to prevent working without such dam; though at the time of building, the river was by no means full; and that the water ran through the channel, after the old dam, extending from the plaintiffs' mill across the river, was carried away, and when there was nothing over one half of the river, to prevent the escape of the main stream.

It was proved that the defendants' channel would injure the plaintiffs' mill if it were a single mill, in case of droughts, such as ordinarily occur in the summer season, although none such occurred during the summer of 1830;—that there would be five and an half feet head at the plaintiffs' mill, when none could run in the defendants' channel, which would drive the plaintiffs' mill very well; but not so well as when the head of water was greater, and especially when so as to run over the plaintiffs' dam; and that, by actual measurement, the bed of the stream, at the entrance of the channel aforesaid, is not so low as the bed of the main stream; nor has been made so low at any time by the defendants. The defendants deepened their channel in 1829, and erected their mill in the same year.

Upon this testimony the defendants contended that they had good and legal right to one half of the water in the main stream, and to take it through the channel aforesaid; as by so doing they were making but a reasonable use of the water; and that they had a right, as riparian proprietors, to open the channel, which they maintained was an ancient channel, and divert the water to their own use in the manner and to the degree which they did; and that the plaintiffs could not contend for more of the stream than was necessary to carry a single mill, which was all the right they could claim by virtue of their grants.

But the Court ruled, that the defendants had no such right to open the channel, or to take the water through the same for the use of their mill; nor such right to divert the water as contended for; that the plaintiffs had all the right in the stream which they had set forth; and so instructed the jury; and that if the defendants did cut or open the channel to the injury of the plaintiffs, they must find

a verdict for the plaintiffs, and assess damages, which they did accordingly, in the sum of one dollar.

The defendants also contended that against them this action could not be maintained, they being tenants in common with the plaintiffs, and, as such, declared against; but that if chargeable in any manner, they were chargeable under a different form of action.

But the Court ruled that the action was maintainable as it stood. To all which the defendants excepted.

Upon this record the following errors were assigned :—

1st. that the Court of Common Pleas ruled and determined that by the legal construction of the deeds produced by the original plaintiffs, they had proved a good title to thirteen sixteenths of the mill, dam and appurtenances, and of the water-course or stream, described in the declaration, when, by such legal construction they had proved title to only three eights and one thirty-second part of said premises.

. 2d. There is error in this; that it was ruled and decided by said court of Common Pleas that the defendants in such original suit, had no right to open the channel, and take the water through the same for the use of their mills, nor to divert the water from the main channel of the River, in the manner and to the extent they did; whereas in law they had that right.

3d. There is error in this; that it was ruled and decided by said court of Common Pleas that the defendants in said original suit, had no right to deepen any part of their channel, to make a reasonable use of the water through the same, or for the purpose of driving their mill; whereas in law they had that right.

4th. There is error in this; that it was ruled and decided by said court of Common Pleas, that the defendants in said original suit, had no right to take the water through their channel, from the main stream, for the purposes and to the extent they did, though their said channel was an ancient channel; whereas in law, they had such right.

5th. There is error in this; that said court of Common Pleas ruled and decided that the original plaintiffs had a right to extend

their dam across the whole river, and to join it to the bank or shore owned by the defendants ; whereas in law, they had no such right.

6th. There is error in this ; that the said court of Common Pleas ruled and decided that the plaintiffs had a right to raise their new dam eight inches higher than their original dam was, and to maintain the same ; whereas in law, they had no such right.

7th. There is error in this ; that said court of Common Pleas ruled and decided that the defendants in the original suit, had not a right to one half the water in the main stream of said river, and to take and use it in and through the channel aforesaid, for the purpose of turning their mill ; whereas they had that right.

8th. There is error in this ; that said court of Common Pleas ruled and decided that the original plaintiffs had a right to erect and maintain the double grist-mill and other buildings and machinery described in the declaration ; whereas they had a right to erect and maintain a single grist-mill only.

9th. There is error in this ; that it was ruled and decided by said court of Common Pleas, that the original plaintiffs, being tenants in common with the defendants' had a legal right to maintain their said action against the defendants aforesaid, in the form aforesaid ; whereas in law they had no such right.

Blanchard & al. *v.* Baker & al.

The following diagram shows the relative positions of the places alluded to in the testimony.

a a Plaintiffs' mill and dam.
b b Defendants' mill and dam.

*Longfellow* and *Mellen* for the plaintiffs in error.

1.  As to the quantum of interest ; the grantors of the original plaintiffs having no greater interest than their portion as heirs, no more than that quantity of estate passed by their deeds. One cannot grant a thing which he has not. *Perk. Grant,* 65 ; 4 *Com. Dig. Grant, D.*

2.  If the original defendants had no right to open the channel and take the water, it was because thereby they infringed some right of the plaintiffs. But the plaintiffs show no title to the water. Their claim is virtually that of an easement in another's land, which is against common right. 3 *Dane's Abr. 4 sec.* 7. The ground of the action is the diversion. But this must be to some extent, and of some consequence, or it is *damnum absque injuria,* and no action lies. The plaintiffs alleged that less water came to their mill, by reason of the defendants' using it as they did. Yet the same consequences would follow from extensive irrigation, and absorption of the water, though the surplus be returned to the natural channel before it passes the mill. Now for such an act the owner of the mill has no remedy. It is the consequence of the legal use of a natural right. *Angell on Water courses,* 32, 140 ; *Weston v. Alden,* 8 *Mass.* 136 ; *Palmer v. Mulligan,* 3 *Caines,* 307 ; *Platt v. Johnson,* 15 *Johns.* 213.

3 and 4.  To these errors, they cited *Angell on Water courses,* 27, *note,* 40, 127 ; 3 *Kent's Com.* 354.

5.  Neither party has a right, where a stream is the boundary, to build his dam beyond the thread of the stream. If it be extended beyond this, the owner of the opposite bank may abate it as a nuisance. *Angell,* 30 ; *Wigford v. Gill, Cro. Eliz.* 269; *Hodges v. Raymond,* 9 *Mass.* 316 ; *Jewell v. Gardiner,* 12 *Mass.* 311. Here the license from Dr. *Jones* was limited till he should want the privilege or water for his own use ; and the defendants, having succeeded to his rights, might lawfully remove the dam from their own side of the river ; and therefore might employ half the water in the manner they did.

6.  The plaintiffs had no right to raise their dam, by the principles of *Sherwood v. Burr,* 4 *Day,* 244, and *Van Bergen v. Van*

*Bergen*, 3 *Johns.* 282. Having done so, they themselves have caused the water to flow through the defendants' channel, of which they now complain.

7. As long as the channel was not lowered deeper than the bed of the main stream, the defendants were in the exercise of a lawful right in clearing it as they did. In *Curtis v. Jackson*, 13 *Mass.* 507, the bed of the river was lowered, on the *Needham* side ; which was not the case here.

8. The plaintiff's right, so far as it is prescriptive in its charac= ter, is limited to the mill and dam in their ancient state. But here they have erected a new double mill, requiring more water, and have raised their dam eight inches higher than before ; thus destroy= ing their own ancient rights, and opening the stream to new com- petition. 3 *Dane's Abr. ch.* 71, *art.* 1, *sec.* 7.

9. The action itself is misconceived. The law has gone no far= ther in the case of tenancy in common, than to allow trespass by one against his co-tenant for a disturbance of his possession, where the several occupation has been by agreement ; *Keay v. Goodwin,* 16 *Mass.* 3 ;—or to give the remedy by action of account, for a due share of the profits. *Jones v. Harraden,* 9 *Mass.* 541 ; *Brig- ham v Eveleth,* 9 *Mass.* 538. But trespass does not lie for entry and enjoyment of the common property. 4 *Kent's Com.* 366. Trespass on the case for disturbance of a right of common lies only against strangers.

*Greenleaf* and *Eastman*, for the defendants in error, cited these authorities. That the original defendants had no right to deepen the channel and divert the water,—*Angell,* 30 ; *Bealey v. Shaw,* 6 *East.* 208 ; *Sands v. Trefuses Cro. Car.* 575 ; *Merritt v. Par- ker,* 1 *Coxe,* 460 ; *Colburn v. Richards,* 13 *Mass.* 420 ; *Beissell v. Sholl,* 4 *Dall.* 211 ; *Cook v. Hull,* 3 *Pick.* 269 ; *Anthony v. Lapham,* 5 *Pick.* 175 ; *Angell,* 36, 57, 138, 149, 71, 181. That no proof of specific damage is necessary, in order to maintain this action,—*Angell,* 50, 53 ; *Hobson v. Todd,* 4 *D. & E.* 71 ; *Pindar v. Wadsworth,* 2 *East.* 158. That erecting a double mill did not change the nature of the estate, or of their interest in the stream,— 3 *Dane's Abr.* 5 ; *Cottrel v. Luttrel,* 4 *Co.* 86. And that tres=

pass on the case is the proper remedy,—*Co. Lit.* 200 *b* ; 2 *Bl. Com.* 193; 3 *Bl. Com.* 221, 235 ; *Angell*, 77.

This argument was heard at the last *May* term, and the opinion of the Court was now delivered by

Weston J. The first question presented is, in what proportions the original plaintiffs (and wherever plaintiffs or defendants are adverted to in this opinion, those who were originally such are intended,) are seised and possessed of the mill and privilege, for an injury to which this action is brought. They claim thirteen sixteenths; while the defendants insist, that they should be restricted to three eighths, and one thirty second part, derived by inheritance from *Samuel Baker*, the elder. If his sons, *Nathaniel*, *Amasa* and *Samuel* the younger, were originally seised each of a quarter in common and undivided, the plaintiffs have established their title to the proportion they claim. If the father died seised of the whole, they are to be restricted to the proportion, accorded to them by the defendants.

It does not appear that the father ever claimed to be sole seised of the land and privilege, upon which the mill was built. His title commenced at the same period with that of his sons, and had its origin in possession and occupancy. Who were the owners in fee at that time is not stated ; but it does not appear that the first occupants, or those who hold under them, have ever been disturbed by any paramount claim ; and their title has now become indefeasable by lapse of time. It is stated that the father had before used the adjoining land for a pasture, but without title. He occupied and fenced the land bordering upon the river, and no one in his life time, except himself, claimed any part of it, saving the mill and privileges appurtenant, which were claimed, occupied and possessed in common by himself and his three sons. This privilege then, derelict by the true owner, was taken up by the father and his three sons, each claiming and enjoying one fourth part of the same, and of the mill thereon erected, in common. And it does not appear that the right of the three sons, or of those claiming under them, to their

34

three fourths, has ever been called in question, until the present action. And we are satisfied, that the title of the three sons is as well sustained as that of the father., His exclusive occupancy to the river might by construction of law have extended his right to the thread of the river, had it not been that this privilege was always excluded from his several and sole claim, and from the first possessed and occupied in common. The first error therefore is not well assigned.

The right to the use of a stream of water, is incident or appurtenant to the land, through which it passes. It is an ancient and well established principle, that it cannot lawfully be diverted, unless it is returned again to its accustomed channel, before it passes the land of a proprietor below. Running water is not susceptible of an appropriation, which will justify the diversion or unreasonable detention of it. The proprietor of the water course has a right to avail himself of its momentum as a power, which may be turned to beneficial purposes. And he may make a reasonable use of the water itself, for domestic purposes, for watering cattle, or even for irriga-tion; provided it is not unreasonably detained, or essentially diminished. For although by the case of *Weston v. Alden,* 7 *Mass.* 136, the right of irrigation might seem to be general and unlimited; yet subsequent cases have restrained it consistently with the enjoyment of the common bounty of nature, by other proprietors, through whose land a stream had been accustomed to flow. *Colburn v. Richards,* 13 *Mass.* 420; *Cook v. Hull,* 3 *Pick.* 269; *Anthony v. Lapham,* 5 *Pick.* 175. And the qualification of the right by these latter decisions, is in accordance with the common law.

It is insisted that the defendants, by deepening the channel running from the main stream, have made a reasonable use of the water, and that it falls within the principle of the right of irrigation; and that, therefore, although the plaintiffs may suffer thereby, it is *damnum absque injuria.* It must however be remembered that the right of irrigation can be exercised only, by returning what is not wanted for this purpose to its accustomed channel. But the defendants diverted the water, used it, and did not return it. They contend that the diversion is justified, because the channel, through

which it was made, was an ancient one. Whether the channel had ever before been made or deepened by artificial means, does not appear. But however that might be, the defendants had a right to the benefit of it in its former state ; but this would not justify any new or further diversion. The case of *Bealey v. Shaw & al.* 6 *East.* 208, states the law in a very satisfactory manner upon this point. It results that the second, third and fourth errors, predicated upon the assumption of a right to deepen the channel, are not well assigned.

The fifth error assigned is, that the Judge decided that the plaintiffs had a right to extend their dam to the eastern shore. This is deduced from his instruction to the jury that the plaintiffs had all the right in the stream, which they had set forth. There may be reason to believe from the evidence reported, that those under whom the plaintiffs claim, originally acknowledged the right of Dr. *Jones* to the eastern shore, and extended their dam to that side by his permission. And if the cause turned upon this point, that fact should have been settled by the jury. The defendants, who have succeeded to the title of *Jones*, prior to the erection of the existing dam in 1828, forbade its extension to their shore, notwithstanding which, however, it was so extended. An adverse seisin and possession of the privilege on that side then commenced, if not before. In *Jewell v. Gardiner*, cited in the argument, the plaintiff was from the beginning a trespasser; and it was held that he derived no right from an appropriation of the stream, which was itself a wrong upon the defendant. But in the case before us, assuming that the privilege on the eastern side was occupied in subordination to the title of Dr. *Jones,* the appropriation of the stream was lawful, and it was continued long enough to give to the owners of the western shore a right, on their side, to the head of water they had raised, which *Jones,* and those holding under him, could not lawfully impair, by operations above or below. The assent and permission given by Dr. *Jones,* presents a case differing materially from that of *Jewell v. Gardiner*. It might admit of great question, how far it was competent for *Jones,* having consented that the owners on the western shore might extend their dam to the eastern side, until such time as he should want the priv-

ilege there, and they being thereupon led to make expensive erections, could revoke the license he had granted, to their prejudice, at least until he did want the privilege on that side.   And if he might do so, no revocation is proved or pretended, until twenty eight years after the license was given.   During all that time, the owners on the western shore, had lawfully raised and appropriated a head of water in their own right, on their side.   Now this right they have never abandoned, but up to the commencement of this action, continued to enjoy.   And if, in the exercise of their right, at and since the erection of the new dam, they have trespassed upon the defendants, they may be answerable to them in an action at law therefor, or it may be that the defendants may lawfully enter, and prostrate the dam on the eastern side, but the right of the plaintiffs to the head of water they had raised on the western side, would remain unimpaired.   When a right of this kind becomes once lawfully vested, it may be asserted and maintained, until abandoned. *Hatch v. Dwight,* 17 *Mass.* 289.   The privilege on the western side, was capable of being enjoyed by a diagonal or wing dam.

But independent of their actual seisin and occupancy of the dam across the river, the plaintiffs have made out a sufficient *gravamen* to sustain their verdict, which was for nominal damages.   They are the undoubted owners of the proportion of the mill they claim, and of the stream on the western side to the thread of the river; and the water has been diverted by the defendants, to the prejudice of their right.   A mill privilege not yet occupied, is valuable for the purposes to which it may be applied.   It is a property, which no one can have a legal right to impair or destroy, by diverting from it the natural flow of the stream, upon which its value depends; although it may be impaired by the exercise of certain lawful rights, originating in prior occupancy.   If an unlawful diversion is suffered for twenty years, it ripens into a right, which cannot be controverted.   If the party injured cannot be allowed in the mean time to vindicate his right by action, it would depend upon the will of others, whether he should be permitted or not, to enjoy that species of property.   The case of *Hobson v. Todd,* 4 *T. R.* 71, presented a similar question in principle, in which the court held, upon a review

of the authorities, that one commoner might maintain an action against another, for an injury to his right, without proof of actual damage. If the plaintiffs have not proved their whole declaration, they have proved the tortious act they complain of, and a consequent damage to their right. They have shown their title to the mills, and to the privilege to the thread of the river. A plaintiff is entitled to judgment, if he proves only a part of his declaration, if the part proved presents a cause of action. If therefore this judgment were reversed, and a new trial granted, the plaintiffs would be entitled to a verdict and judgment upon the same evidence.

The sixth error assigned is founded upon a deduction from the instructions of the Judge, that the plaintiffs had a right to raise their new dam and to maintain it, eight inches higher than their old one was. In *Beissell v. Sholl*, 4 *Dall.* 211, the court say, " that every man in this country has an unquestionable right to erect a mill upon his own land ; and to use the water passing through his land as he pleases ; subject only to this limitation, that his mill must not be so constructed and employed, as to injure his neighbor's mill ; and that after using the water, he returns the stream to its ancient channel." The doctrine laid down by *Blackstone* is, that " if a stream be unoccupied, I may erect a mill thereon, and detain the water ; yet not so as to injure my neighbor's prior mill, or his meadow." And in *Hatch v. Dwight*, before cited, *Parker C. J.* says, " the owner of a mill site, who first occupied it, by erecting a dam and mill, will have a right to water sufficient to work his wheels, if his privilege will afford it ; notwithstanding he may, by his occupation, render useless the privilege of any one above or below him upon the same stream." Now as the defendants did not erect their mill, until the plaintiffs' dam was raised, they had, by these authorities, the same right to raise it, as they had originally to build it to its first elevation. The right however, arising from mere prior occupancy, to this extent, has not been held in some cases as exclusive, unless continued for twenty years. *Platt v. Johnson*, 15 *Johns.* 213 ; *Tyler v. Wilkinson*, 4 *Mason*, 397. And we do not deem it necessary in the present case to decide, that by prior occupancy, the plaintiffs had acquired an exclusive right to the entire head of water, raised by

their new dam. But if they had no lawful authority in 1828 to ex-. tend their dam to the eastern shore, or to give it at that time an additional elevation, and derive therefore no rights from it, the cause of action before stated, would remain unaffected. Within the limitation stated in *Beissell v. Sholl*, the defendants had a right to change the character of their mills upon their privilege as they pleased, and to take them, or either of them, down and substitute others. 3 *Dane* 5, and the cases there cited. It does not appear that the plaintiffs' double grist mill is a use of the privilege, beyond that of the mills, which were conveyed to them. And this is a sufficient an-. swer to the eighth error.

The seventh error assumes that the defendants, as the owners of the eastern shore, had a right to half the water, and a right to divert it to that extent. It has been seen, that if they had been the owners of both sides, they had no right to divert the water, without again returning it to its original channel. Besides, it was impossible in the nature of things that they could take it from their side only. An equal portion from the plaintiffs' side, must have been mingled with all that was diverted.

The defendants lastly object to the form of the action. The plaintiffs have sustained an injury ; and are therefore entitled to a legal remedy. No form more apt or appropriate has been suggested. It is that which has been used and approved, for injuries arising from the diversion of a water course. The objection is technical ; founded upon the relation in which the plaintiffs stand, as tenants in common with the defendants. Trespass does not in general lie by one tenant in common against another ; because each has an equal right to the possession. But if one destroy that which is held in common, it does. And, upon the same principle, case would doubtless lie, where the destruction was not immediate, but consequent upon the act of one of the tenants in common. If all the water had been diverted, the plaintiffs' privilege would have been destroyed. If partially, it would seem to have been a destruction *pro tanto*. If two several owners of houses have a river in common between them, if one of them corrupts the river, the other shall have an action on the

case. *Co. Lit.* 200, *b* ; *Hobson v. Todd,* before cited, was case by one commoner against another, for surcharging the common, and no objection was taken to the form of the action. And we are of opinion, that this action may be supported upon authority, and the fair analogies of the law.

*Judgment affirmed.*