(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UZUEGBUNAM ET AL. *v.* PRECZEWSKI ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 19–968.   Argued January 12, 2021—Decided March 8, 2021

Petitioners are former students of Georgia Gwinnett College who wished to exercise their religion by sharing their faith on campus while enrolled there.  In 2016, Chike Uzuegbunam talked with interested students and handed out religious literature on campus grounds.  Uzuegbunam stopped after a campus police officer informed him that campus policy prohibited distributing written religious materials outside areas designated for that purpose.  A college official later explained to Uzuegbunam that he could speak about his religion or distribute materials only in two designated speech areas on campus, and even then only after securing a permit.  But when Uzuegbunam obtained the required permit and tried to speak in a free speech zone, a campus police officer again asked him to stop, this time saying that people had complained about his speech.  Campus policy at that time prohibited using the free speech zone to say anything that "disturbs the peace and/or comfort of person(s)."  The officer told Uzuegbunam that his speech violated campus policy because it had led to complaints, and the officer threatened Uzuegbunam with disciplinary action if he continued.  Uzuegbunam again complied with the order to stop speaking.  Another student who shares Uzuegbunam's faith, Joseph Bradford, decided not to speak about religion because of these events.  Both Uzuegbunam and Bradford sued certain college officials charged with enforcement of the college's speech policies, arguing that these policies violated the First Amendment.  As relevant here, the students sought injunctive relief and nominal damages.  The college officials ultimately chose to discontinue the challenged policies rather than to defend them, and they sought dismissal on the ground that the policy change left the students without standing to sue.  The parties agreed that the policy change rendered the students' request for injunctive relief moot, but disputed

whether the students had standing to maintain the suit based on their remaining claim for nominal damages. The Eleventh Circuit held that while a request for nominal damages can sometimes save a case from mootness, such as where a person pleads but fails to prove an amount of compensatory damages, the students' plea for nominal damages alone could not by itself establish standing.

*Held*: A request for nominal damages satisfies the redressability element necessary for Article III standing where a plaintiff's claim is based on a completed violation of a legal right. Pp. 3–12.

(a) To establish Article III standing, the Constitution requires a plaintiff to identify an injury in fact that is fairly traceable to the challenged conduct and to seek a remedy likely to redress that injury. *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 338. The dispute here concerns whether the remedy Uzuegbunam sought—nominal damages—can redress the completed constitutional violation that he alleges occurred when campus officials enforced the speech policies against him. The Court looks to the forms of relief awarded at common law to determine whether nominal damages can redress a past injury. The prevailing rule at common law was that a party whose rights are invaded can always recover nominal damages without furnishing evidence of actual damage. By permitting plaintiffs to pursue nominal damages whenever they suffered a personal legal injury, the common law avoided the oddity of privileging small economic rights over important, but not easily quantifiable, nonpecuniary rights. Pp. 3–8.

(b) The common law did not require a plea for compensatory damages as a prerequisite to an award of nominal damages. Nominal damages are not purely symbolic. They are instead the damages awarded by default until the plaintiff establishes entitlement to some other form of damages. A single dollar often will not provide full redress, but the partial remedy satisfies the redressability requirement. *Church of Scientology of Cal.* v. *United States*, 506 U. S. 9, 13. Respondents' argument that a plea for compensatory damages is necessary to confer jurisdiction also does not square with established principles of standing. And unlike an award of attorney's fees and costs which may be the byproduct of a successful suit, an award of nominal damages constitutes relief on the merits. Pp. 8–11.

(c) A request for redress in the form of nominal damages does not guarantee entry to court. In addition to redressability, the plaintiff must establish the other elements of standing and satisfy all other relevant requirements, such as pleading a cognizable cause of action. Uzuegbunam experienced a completed violation of his constitutional rights when respondents enforced their speech policies against him. Nominal damages can redress Uzuegbunam's injury even if he cannot or chooses not to quantify that harm in economic terms. The Court

Syllabus

does not decide whether Bradford can pursue nominal damages and leaves for the District Court to determine whether Bradford has established a past, completed injury. Pp. 11–12.

781 Fed. Appx. 824, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which BREYER, ALITO, SOTOMAYOR, KAGAN, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. KAVANAUGH, J., filed a concurring opinion. ROBERTS, C. J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 19–968

CHIKE UZUEGBUNAM, ET AL., PETITIONERS *v.*
STANLEY C. PRECZEWSKI, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[March 8, 2021]

JUSTICE THOMAS delivered the opinion of the Court.

At all stages of litigation, a plaintiff must maintain a personal interest in the dispute. The doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings. To demonstrate standing, the plaintiff must not only establish an injury that is fairly traceable to the challenged conduct but must also seek a remedy that redresses that injury. And if in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case generally is moot. This case asks whether an award of nominal damages by itself can redress a past injury. We hold that it can.

I

According to the complaint, Chike Uzuegbunam is an evangelical Christian who believes that an important part of exercising his religion includes sharing his faith. In 2016, Uzuegbunam decided to share his faith at Georgia Gwinnett College, a public college where he was enrolled as a student. At an outdoor plaza on campus near the library

where students often gather, Uzuegbunam engaged in conversations with interested students and handed out religious literature.

A campus police officer soon informed Uzuegbunam that campus policy prohibited distributing written religious materials in that area and told him to stop. Uzuegbunam complied with the officer's order. To learn more about this policy, he then visited the college's Director of the Office of Student Integrity, who was directly responsible for promulgating and enforcing the policy. When asked if Uzuegbunam could continue speaking about his religion if he stopped distributing materials, the official said no. The official explained that Uzuegbunam could speak about his religion or distribute materials only in two designated "free speech expression areas," which together make up just 0.0015 percent of campus. And he could do so only after securing the necessary permit. Uzuegbunam then applied for and received a permit to use the free speech zone.

Twenty minutes after Uzuegbunam began speaking on the day allowed by his permit, another campus police officer again told him to stop, this time saying that people had complained about his speech. Campus policy prohibited using the free speech zone to say anything that "disturbs the peace and/or comfort of person(s)." App. to Pet. for Cert. 151(a). The officer told Uzuegbunam that his speech violated this policy because it had led to complaints. The officer threatened Uzuegbunam with disciplinary action if he continued. Uzuegbunam again complied with the order to stop speaking. Another student who shares Uzuegbunam's faith, Joseph Bradford, decided not to speak about religion because of these events.

Both students sued a number of college officials in charge of enforcing the college's speech policies, arguing that those policies violated the First Amendment. As relevant here, they sought nominal damages and injunctive relief. Respondents initially attempted to defend the policy, stating

that Uzuegbunam's discussion of his religion "arguably rose to the level of 'fighting words.'" *Id.,* at 155(a). But the college officials quickly abandoned that strategy and instead decided to get rid of the challenged policies. They then moved to dismiss, arguing that the suit was moot, because of the policy change. The students agreed that injunctive relief was no longer available, but they disagreed that the case was moot. They contended that their case was still live because they had also sought nominal damages. The District Court dismissed the case, holding that the students' claim for nominal damages was insufficient by itself to establish standing.

The Eleventh Circuit affirmed. 781 Fed. Appx. 824 (2019). It stated that a request for nominal damages can save a case from mootness in certain circumstances, such as where a person pleads but fails to prove an amount of compensatory damages. But, because the students did not request compensatory damages, their plea for nominal damages could not by itself establish standing.

We granted certiorari to consider whether a plaintiff who sues over a completed injury and establishes the first two elements of standing (injury and traceability) can establish the third by requesting only nominal damages. 591 U. S. ___ (2020). We now reverse.

## II

To satisfy the "'irreducible constitutional minimum'" of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury. *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 338 (2016); see also *Gill* v. *Whitford*, 585 U. S. ___, ___–___ (2018) (slip op., at 13–14). There is no dispute that Uzuegbunam has established the first two elements. The only question is whether the remedy he sought—nominal damages—can redress the constitutional violation that

Uzuegbunam alleges occurred when campus officials enforced the speech policies against him.

## A

In determining whether nominal damages can redress a past injury, we look to the forms of relief awarded at common law. "Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U. S. 765, 774 (2000) (quoting *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 102 (1998)); cf. *Memphis Community School Dist.* v. *Stachura*, 477 U. S. 299, 306 (1986) (relief for "§1983 plaintiffs . . . is ordinarily determined according to principles derived from the common law of torts"). The parties here agree that courts at common law routinely awarded nominal damages. They, instead, dispute what kinds of harms those damages could redress.

Both sides agree that nominal damages historically could provide prospective relief. The award of nominal damages was one way for plaintiffs at common law to "obtain a form of declaratory relief in a legal system with no general declaratory judgment act." D. Laycock & R. Hasen, Modern American Remedies 636 (5th ed. 2019). For example, a trespass to land or water rights might raise a prospective threat to a property right by creating the foundation for a future claim of adverse possession or prescriptive easement. *Blanchard* v. *Baker*, 8 Me. 253, 268 (1832) ("If an unlawful diversion [of water] is suffered for twenty years, it ripens into a right, which cannot be controverted"). By obtaining a declaration of trespass, a property owner could "vindicate his right by action" and protect against those future threats. *Ibid.* Courts at common law would not declare property boundaries in the abstract, "but the suit for nominal damages allowed them to do so indirectly." Laycock,

*supra,* at 636.

The parties disagree, however, about whether nominal damages alone could provide retrospective relief. Stressing the declaratory function, respondents argue that nominal damages by themselves redressed only continuing or threatened injury, not past injury.

But cases at common law paint a different picture. Early courts required the plaintiff to prove actual monetary damages in every case: "[I]njuria & damnum [injury and damage] are the two grounds for the having [of] all actions, and without these, no action lieth." *Cable* v. *Rogers*, 3 Bulst. 311, 312, 81 Eng. Rep. 259 (K. B. 1625). Later courts, however, reasoned that *every* legal injury necessarily causes damage, so they awarded nominal damages absent evidence of other damages (such as compensatory, statutory, or punitive damages), and they did so where there was no apparent continuing or threatened injury for nominal damages to redress. See, *e.g., Barker* v. *Green*, 2 Bing. 317, 130 Eng. Rep. 327 (C. P. 1824) (nominal damages awarded for 1-day delay in arrest because "if there was a breach of duty the law would presume some damage"); *Hatch* v. *Lewis*, 2 F. & F. 467, 479, 485–486, 175 Eng. Rep. 1145, 1150, 1153 (N. P. 1861) (ineffective assistance by criminal defense attorney that does not prejudice the client); *Dods* v. *Evans*, 15 C. B. N. S. 621, 624, 627, 143 Eng. Rep. 929, 930–931 (C. P. 1864) (breach of contract); *Marzetti* v. *Williams*, 1 B. & Ad. 415, 417–418, 423–428, 109 Eng. Rep. 842, 843, 845–847 (K. B. 1830) (bank's 1-day delay in paying on a check); *id.,* at 424, 109 Eng. Rep., at 845 (recognizing that breach of contract could create a continuing injury but determining that the fact of breach of contract by itself justified nominal damages).

The latter approach was followed both before and after ratification of the Constitution. An early case about voting rights effectively illustrates this common-law understanding. Faced with a suit pleading denial of the right to vote,

the court rejected the plaintiff's claim because, among other reasons, the plaintiff had not established actual damages. *Ashby* v. *White*, 2 Raym. Ld. 938, 941–943, 948, 92 Eng. Rep. 126, 129, 130, 133 (K. B. 1703). Dissenting, Lord Holt argued that the common law inferred damages whenever a legal right was violated. Observing that the law recognized "not merely pecuniary" injury but also "personal injury," Lord Holt stated that "every injury imports a damage" and that a plaintiff could always obtain damages even if he "does not lose a penny by reason of the [violation]." *Id.*, at 955, 92 Eng. Rep., at 137. Although Lord Holt was in the minority, the House of Lords overturned the majority decision, thus validating Lord Holt's position, 3 Salk. 17, 91 Eng. Rep. 665 (K. B. 1703), and this principle "laid down . . . by Lord Holt" was followed "in many subsequent cases," *Embrey* v. *Owen*, 6 Exch. 353, 368, 155 Eng. Rep. 579, 585 (1851).

The dissent correctly notes that English courts differed in some respects from courts under our system, but Lord Holt's position also prevailed in courts on this side of the Atlantic. Applying what he called Lord Holt's "incontrovertible" reasoning, Justice Story explained that a prevailing plaintiff "is entitled to a verdict for nominal damages" whenever "no other [kind of damages] be proved." *Webb* v. *Portland Mfg. Co.*, 29 F. Cas. 506, 508–509 (No. 17,322) (CC Me. 1838). Because the common law recognized that "every violation imports damage," Justice Story reasoned that "[t]he law tolerates no farther inquiry than whether there has been the violation of a right." *Ibid.* Justice Story also made clear that this logic applied to both retrospective and prospective relief. *Id.,* at 507 (stating that nominal damages are available "wherever there is a wrong" and that, "[a] fortiori, this doctrine applies where there is not only a violation of a right of the plaintiff, but the act of the defendant, if continued, may become the foundation, by lapse of time, of an adverse right").

The dissent discounts Justice Story's statement, saying that he took a potentially contradictory position elsewhere and asserted that both actual damages and a violation of a legal right are required. *Post,* at 7–8 (opinion of ROBERTS, C. J.). But in the same source the dissent cites, Justice Story said that nominal damages are "presumed" "[w]here the breach of duty is clear." Commentaries on the Law of Agency §217, p. 211 (1839). Justice Story adopted the same position a few years later. *Whipple* v. *Cumberland Mfg. Co.,* 29 F. Cas. 934, 936 (No. 17,516) (CC Me. 1843) (stating that it is "well-known and well-settled" that "wherever a wrong is done to a right," at minimum "nominal damages will be given"). And other jurists declared that "[t]he principle that every injury legally imports damage, was decisively settled, in the case of *Ashby*." *Parker* v. *Griswold*, 17 Conn. \*288, \*304–\*306 (1845) (citing many cases on both sides of the Atlantic, including *Webb* and *Marzetti*). This history is hardly one of "indeterminate sources." *Post,* at 8.

Admittedly, the rule allowing nominal damages for a violation of any legal right, though "decisively settled," *Parker,* 17 Conn., at \*304, was not universally followed—as is true for most common-law doctrines. And some courts only followed the rule in part, recognizing the availability of nominal damages but holding that the improper denial of nominal damages could be harmless error. Yet, even among these courts, many adopted the rule in full whenever a person proved that there was a violation of an "important right." *E.g., Hecht* v. *Harrison*, 5 Wyo. 279, 290, 40 P. 306, 309–310 (1895); accord, *Reid* v. *Johnson*, 132 Ind. 416, 419, 31 N. E. 1107, 1108 (1892) ("substantial right"). Nonetheless, the prevailing rule, "well established" at common law, was "that a party whose rights are invaded can always recover nominal damages without furnishing any evidence of actual damage." 1 T. Sedgwick, Measure of Damages 71, n. a (7th ed. 1880); see also *id.,* at 72 (citing Lord Holt's opinion in *Ashby*).

That this rule developed at common law is unsurprising in the light of the noneconomic rights that individuals had at that time. A contrary rule would have meant, in many cases, that there was no remedy at all for those rights, such as due process or voting rights, that were not readily reducible to monetary valuation. See D. Dobbs, Law of Remedies §3.3(2) (3d ed. 2018) (nominal damages are often awarded for a right "not economic in character and for which no substantial non-pecuniary award is available"); see also *Carey* v. *Piphus*, 435 U. S. 247, 266–267 (1978) (awarding nominal damages for a violation of procedural due process). By permitting plaintiffs to pursue nominal damages whenever they suffered a personal legal injury, the common law avoided the oddity of privileging small-dollar economic rights over important, but not easily quantifiable, nonpecuniary rights.

B

Respondents and the dissent attempt to discount this historical line of cases by contending that something other than nominal damages provided redressability. They argue instead that courts could award nominal damages only when a plaintiff pleaded compensatory damages but failed to prove a specific amount. In those circumstances, they say, the plea for compensatory damages is what satisfied the redressability requirement, and courts awarded nominal damages merely as a technical matter. We do not agree.

To begin with, the cases themselves did not require a plea for compensatory damages as a condition for receiving nominal damages. Lord Holt spoke in categorical terms: "[E]very injury imports a damage," so a plaintiff who proved a legal violation could always obtain some form of damages because he "must of necessity have a means to vindicate and maintain [the right]." *Ashby*, 2 Raym. Ld., at 953–955, 92 Eng. Rep., at 136–137. Justice Story's language was no less definitive: "The law tolerates no farther inquiry than

whether there has been the violation of a right." *Webb*, 29 F. Cas., at 508. When a right is violated, that violation "imports damage in the nature of it" and "the party injured is entitled to a verdict for nominal damages." *Id.*, at 508.

Respondents and the dissent thus get the relationship between nominal damages and compensatory damages backwards. Nominal damages are not a consolation prize for the plaintiff who pleads, but fails to prove, compensatory damages. They are instead the damages awarded by default until the plaintiff establishes entitlement to some other form of damages, such as compensatory or statutory damages. See, *e.g., Dods*, 15 C. B. N. S., at 621, 627, 143 Eng. Rep., at 929, 931 (prevailing plaintiff entitled to nominal damages as a matter of law even where jury neglected to find them); see also *Stachura*, 477 U. S., at 308 (rejecting the argument that courts could presume, without proof, damages greater than nominal).

The argument that a claim for compensatory damages is a prerequisite for an award of nominal damages also rests on the flawed premise that nominal damages are purely symbolic, a mere judicial token that provides no actual benefit to the plaintiff. That contention is not without some support. See, *e.g., Stanton* v. *New York & Eastern R. Co.*, 59 Conn. 272, 282, 22 A. 300, 303 (1890) ("Nominal damages mean no damages at all. They exist only in name, and not in amount"); but cf. *ibid.* (still recognizing that nominal damages are appropriate when a right is violated). But this view is against the weight of the history discussed above, and we have already expressly rejected it. Despite being small, nominal damages are certainly concrete. The dissent says that "an award of nominal damages does not change [a plaintiff's] status or condition at all." *Post,* at 3. But we have already held that a person who is awarded nominal damages receives "relief on the merits of his claim" and "may demand payment for nominal damages no less than

he may demand payment for millions of dollars in compensatory damages." *Farrar* v. *Hobby*, 506 U. S. 103, 111, 113 (1992). Because nominal damages are in fact damages paid to the plaintiff, they "affec[t] the behavior of the defendant towards the plaintiff" and thus independently provide redress. *Hewitt* v. *Helms*, 482 U. S. 755, 761 (1987) (emphasis deleted); accord, *Mission Product Holdings, Inc.* v. *Tempnology, LLC*, 587 U. S. ___, ___ (2019) (slip op., at 6) ("If there is any chance of money changing hands, [the] suit remains live"). True, a single dollar often cannot provide full redress, but the ability "to effectuate a partial remedy" satisfies the redressability requirement. *Church of Scientology of Cal.* v. *United States*, 506 U. S. 9, 13 (1992).

The next difficulty faced by respondents and the dissent is their inability to square their argument with established principles of standing. Because redressability is an "'irreducible'" component of standing, *Spokeo*, 578 U. S., at 338, no federal court has jurisdiction to enter a judgment unless it provides a remedy that can redress the plaintiff's injury. Yet early courts routinely awarded nominal damages alone. Certainly, no one seems to think that those judgments were without legal effect. Those nominal damages necessarily must have provided redress. Respondents contend that a request for compensatory damages at the pleading stage was what provided the basis for nominal damages at the judgment stage. But a plaintiff must maintain a personal interest in the dispute at every stage of litigation, including when judgment is entered, *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 561 (1992), and must do so "separately for each form of relief sought," *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 185 (2000). As soon as a plea for compensatory damages fails at the factfinding stage of litigation, that plea can no longer support jurisdiction for a favorable judgment. The dissent's contrary assertion is unaccompanied by any citation.

Likewise, any analogy to attorney's fees and costs fails. A request for attorney's fees or costs cannot establish standing because those awards are merely a "byproduct" of a suit that already succeeded, not a form of redressability. *Steel Co.*, 523 U. S., at 107; see also *Lewis* v. *Continental Bank Corp.*, 494 U. S. 472, 480 (1990). In contrast, nominal damages are redress, not a byproduct.

## III

Because nominal damages were available at common law in analogous circumstances, we conclude that a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right.

The dissent worries that after today the Judiciary will be required to weigh in on legal questions "whenever a plaintiff asks for a dollar." *Post,* at 9. But petitioners still would have satisfied redressability if instead of one dollar in nominal damages they sought one dollar in compensation for a wasted bus fare to travel to the free speech zone. The dissent "would place a higher value on Article III" than a dollar. *Post,* at 1; but see *Sprint Communications Co.* v. *APCC Services, Inc.*, 554 U. S. 269, 305 (2008) (ROBERTS, C. J., dissenting) ("Article III is worth a dollar"). But Congress abolished the statutory amount-in-controversy requirement for federal-question jurisdiction in 1980. Federal Question Jurisdictional Amendments Act, 94 Stat. 2369. And we have never held that one applies as a matter of constitutional law.

This is not to say that a request for nominal damages guarantees entry to court. Our holding concerns only redressability. It remains for the plaintiff to establish the other elements of standing (such as a particularized injury); plead a cognizable cause of action, *Planck* v. *Anderson*, 5 T. R. 37, 41, 101 Eng. Rep. 21, 23 (K. B. 1792) ("if no [actual] damage be sustained, the creditor has no cause of action"

for some claims); and meet all other relevant requirements. We hold only that, for the purpose of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right.

Applying this principle here is straightforward. For purposes of this appeal, it is undisputed that Uzuegbunam experienced a completed violation of his constitutional rights when respondents enforced their speech policies against him. Because "every violation [of a right] imports damage," *Webb*, 29 F. Cas., at 509, nominal damages can redress Uzuegbunam's injury even if he cannot or chooses not to quantify that harm in economic terms.*

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

*We do not decide whether Bradford can pursue nominal damages. Nominal damages go only to redressability and are unavailable where a plaintiff has failed to establish a past, completed injury. The District Court should determine in the first instance whether the enforcement against Uzuegbunam also violated Bradford's constitutional rights.

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–968

_____

CHIKE UZUEGBUNAM, ET AL., PETITIONERS *v.*
STANLEY C. PRECZEWSKI, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[March 8, 2021]

JUSTICE KAVANAUGH, concurring.

I agree with the Court that, as a matter of history and precedent, a plaintiff's request for nominal damages can satisfy the redressability requirement for Article III standing and can keep an otherwise moot case alive. I write separately simply to note that I agree with THE CHIEF JUSTICE and the Solicitor General that a defendant should be able to accept the entry of a judgment for nominal damages against it and thereby end the litigation without a resolution of the merits. *Post*, at 11 (ROBERTS, C. J., dissenting); Brief for United States as *Amicus Curiae* 29–30.

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–968

_____

## CHIKE UZUEGBUNAM, ET AL., PETITIONERS *v.* STANLEY C. PRECZEWSKI, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[March 8, 2021]

CHIEF JUSTICE ROBERTS, dissenting.

Petitioners Chike Uzuegbunam and Joseph Bradford want to challenge the constitutionality of speech restrictions at Georgia Gwinnett College. There are just a few problems: Uzuegbunam and Bradford are no longer students at the college. The challenged restrictions no longer exist. And the petitioners have not alleged actual damages. The case is therefore moot because a federal court cannot grant Uzuegbunam and Bradford "any effectual relief whatever." *Chafin* v. *Chafin*, 568 U. S. 165, 172 (2013) (internal quotation marks omitted).

The Court resists this conclusion, holding that the petitioners can keep pressing their claims because they have asked for "nominal damages." In the Court's view, nominal damages can save a case from mootness because any amount of money—no matter how trivial—"can redress a past injury." *Ante,* at 1. But an award of nominal damages does not alleviate the harms suffered by a plaintiff, and is not intended to. If nominal damages can preserve a live controversy, then federal courts will be required to give advisory opinions whenever a plaintiff tacks on a request for a dollar. Because I would place a higher value on Article III, I respectfully dissent.

I

In urging the ratification of the Constitution, Alexander Hamilton famously wrote that "the judiciary, from the nature of its functions, will always be the least dangerous" of "the different departments of power." The Federalist No. 78, p. 465 (C. Rossiter ed. 1961). This was so, Hamilton explained, because the Judiciary "will be least in a capacity to annoy or injure" "the political rights of the Constitution." *Ibid.* Whereas "[t]he executive not only dispenses the honors but holds the sword of the community," and "[t]he legislature not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated," the Judiciary "may truly be said to have neither FORCE nor WILL but merely judgment." *Ibid.*

But that power of judgment can nonetheless bind the Executive and Legislature—and the States. It is modest only if confined to its proper sphere. As John Marshall emphasized during his one term in the House of Representatives, "[i]f the judicial power extended to every *question* under the constitution" or "to every *question* under the laws and treaties of the United States," then "[t]he division of power [among the branches of Government] could exist no longer, and the other departments would be swallowed up by the judiciary." 4 Papers of John Marshall 95 (C. Cullen ed. 1984) (quoted in *DaimlerChrysler Corp.* v. *Cuno,* 547 U. S. 332, 341 (2006)). To maintain adequate separation between the Judiciary, on the one hand, and the political branches and the States, on the other, Article III of the Constitution authorizes federal courts to decide only "Cases" and "Controversies"—that is, "cases of a Judiciary nature." 2 Records of the Federal Convention of 1787, p. 430 (M. Farrand ed. 1966) (J. Madison).

The case-or-controversy requirement imposes fundamental restrictions on who can invoke federal jurisdiction and what types of disputes federal courts can resolve. As pertinent here, "when it is impossible for a court to grant any

effectual relief whatever to the prevailing party," *Chafin*, 568 U. S., at 172 (internal quotation marks omitted), the case is moot, and the court has no power to decide it, see *Spencer* v. *Kemna*, 523 U. S. 1, 18 (1998). To decide a moot case would be to give an advisory opinion, in violation of "the oldest and most consistent thread in the federal law of justiciability." *Flast* v. *Cohen*, 392 U. S. 83, 96 (1968) (internal quotation marks omitted).

By insisting that judges be able to provide meaningful redress to litigants, Article III ensures that federal courts exercise their authority only "as a necessity in the determination of real, earnest and vital controversy between individuals." *Chicago & Grand Trunk R. Co.* v. *Wellman*, 143 U. S. 339, 345 (1892); see *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 471 (1982) ("The constitutional power of federal courts cannot be defined, and indeed has no substance, without reference to the necessity 'to adjudge the legal rights of litigants in actual controversies.'" (quoting *Liverpool, New York & Philadelphia S. S. Co.* v. *Commissioners of Emigration*, 113 U. S. 33, 39 (1885))). When plaintiffs like Uzuegbunam and Bradford allege neither actual damages nor the prospect of future injury, an award of nominal damages does not change their status or condition at all. Such an award instead represents a judicial determination that the plaintiffs' interpretation of the law is correct—nothing more. The court in such a case is acting not as an Article III court, but as a moot court, deciding cases "in the rarified atmosphere of a debating society." *Director, Office of Workers' Compensation Programs* v. *Perini North River Associates*, 459 U. S. 297, 305 (1983) (internal quotation marks omitted).

## II

The Court sees no problem with turning judges into advice columnists. In its view, the common law and (to a

lesser extent) our cases require that federal courts open their doors to any plaintiff who asks for a dollar. I part ways with the Court regarding both the framework it applies and the result it reaches.

Begin with the framework. The Court's initial premise is that we must "look to the forms of relief awarded at common law" in order to decide "whether nominal damages can redress a past injury." *Ante,* at 4. Because the Court finds that "nominal damages were available at common law in analogous circumstances" to the ones before us, it "conclude[s] that a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Ante,* at 11.

Any lessons that we learn from the common law, however, must be tempered by differences in constitutional design. The structure and function of 18th-century English courts were in many respects irreconcilable with "the role assigned to the judiciary in a tripartite allocation of power." *Flast,* 392 U. S., at 95. Perhaps most saliently, in England "all jurisdictions of courts [were] either mediately or immediately derived from the crown," 1 W. Blackstone, Commentaries on the Laws of England 257 (1765), an organizational principle the Framers explicitly rejected by separating the Executive from the Judiciary. This difference in organization yielded a difference in operation. To give just one example, "English judicial practice with which early Americans were familiar had long permitted the Crown to solicit advisory opinions from judges." R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 52 (7th ed. 2015). We would not look to such practice for guidance today if a plaintiff came into court arguing that advisory opinions were in fact an appropriate form of Article III redress. We would know that they are not. We likewise should know that a bare request for nominal damages is not justiciable because the

plaintiff cannot "benefit in a tangible way from the court's intervention." *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 103, n. 5 (1998) (internal quotation marks omitted).

We should of course consult founding-era decisions when discerning the boundaries of our jurisdiction, for the Framers sought to limit the judicial power to "Cases" and "Controversies," as those terms were understood at the time. See *Coleman* v. *Miller*, 307 U. S. 433, 460 (1939) (opinion of Frankfurter, J.). No question. But that does not mean that the requirements of Article III are "satisfied merely because a party requests a court of the United States to declare its legal rights, and has couched that request for forms of relief historically associated with courts of law in terms that have a familiar ring to those trained in the legal process." *Valley Forge*, 454 U. S., at 471. A focus on common law analogues cannot obscure the significance of the establishment of an independent Judiciary—a "remarkable transformation" from a system with courts operating as "appendages of crown power." Gordon S. Wood, The Origins of Judicial Review, 22 Suffolk U. L. Rev. 1293, 1304 (1988). That transformation carries with it the need to cabin the jurisdiction of the Judiciary to ensure it does not trespass on the province of the political branches.

It is in any event entirely unclear whether common law courts would have awarded nominal damages in a case like the one before us. There is no dispute that "nominal damages historically could provide *prospective* relief," because such awards allowed "plaintiffs at common law to 'obtain a form of declaratory relief in a legal system with no general declaratory judgment act.'" *Ante,* at 4 (quoting D. Laycock & R. Hasen, Modern American Remedies 636 (5th ed. 2019); emphasis added); see Borchard, The Declaratory Judgment—A Needed Procedural Reform, 28 Yale L. J. 1, 25–29 (1918) (describing the development of declaratory judgments in England in the second half of the 19th century). Yet the

petitioners in this case no longer seek prospective relief. Although they initially asked for a declaratory judgment and a preliminary injunction, they abandoned those requests once the college rescinded the challenged policies.

The Court is correct to note that plaintiffs at common law often received nominal damages for past violations of their rights. Those awards, however, were generally limited to situations in which prevailing plaintiffs tried and failed to prove actual damages. See 1 D. Dobbs, Law of Remedies §3.3(2), p. 296 (2d ed. 1993) (describing nominal damages awards as "a rescue operation"). Notwithstanding the Court's protestations to the contrary, nominal damages in such cases were in fact a "consolation prize," *ante,* at 9, awarded as a hook to allow prevailing plaintiffs to at least recover attorney's fees and costs. See W. Hale, Handbook on the Law of Damages 30–31 (1896) ("The importance of the right to recover nominal damages often consists in its effect on costs."); 1 T. Sedgwick, Measure of Damages §96, p. 164 (9th ed. 1912) ("[T]hey are a mere peg to hang costs on." (internal quotation marks omitted)). The petitioners in this case have asked to recover their fees and costs, but they never sought actual damages, so the common law provides little relevant support.

On this last point, the Court acknowledges in several places that the historical record is mixed as to whether legal violations were actionable *at all* without a showing of compensable harm. See *ante,* at 5, 7. And the Court does not cite any case in which plaintiffs sought only nominal damages for purely retrospective injuries. The Court instead relies on several decisions that contained live damages claims, see *Barker* v. *Green*, 2 Bing. 317, 130 Eng. Rep. 327 (C. P. 1824) ("actual damage was the gist of the action"); *Hatch* v. *Lewis*, 2 F. & F. 467, 469, 175 Eng. Rep. 1145, 1146 (N. P. 1861) (defendants' ineffective assistance allegedly caused plaintiff to be "deprived of the profits and emoluments he might otherwise have obtained"); *Dods* v. *Evans*,

15 C. B. N. S. 621, 143 Eng. Rep. 929 (C. P. 1864) (action for damages), or involved prospective harm to the plaintiff's reputation, see *Marzetti* v. *Williams*, 1 B. & Ad. 415, 420, 109 Eng. Rep. 842, 844 (K. B. 1830) (bank's failure to timely pay "was injurious to the character of the plaintiff in his trade"); see also C. Addison, Law of Torts 46–47 (1860) (defamation actionable without proof of damage).

The Court also appeals to "categorical" and "definitive" statements by Lord Chief Justice Holt and Justice Story, that "every injury imports a damage," *Ashby* v. *White*, 2 Raym. Ld. 938, 955, 92 Eng. Rep. 126, 137 (K. B. 1703), and that "[t]he law tolerates no farther inquiry than whether there has been the violation of a right," *Webb* v. *Portland Mfg. Co.*, 29 F. Cas. 506, 508 (No. 17,322) (CC Me. 1838). *Ante,* at 8–9. These statements, however, bear less weight than the Court suggests. Lord Holt was alone in dissent in *Ashby* (no shame there), and although his opinion has been cited favorably by subsequent cases and commentary, his colleagues disagreed with him. The Court writes that "the House of Lords overturned the majority decision, thus validating Lord Holt's position," *ante,* at 6, but the House of Lords likely paid scant attention to Lord Holt's analysis. It appears instead that the majority decision was reversed as collateral damage in a Whig-Tory political dispute, and "little weight was given to reasoning or eloquence." 2 J. Campbell, Lives of the Chief Justices of England 160 (1849). (Ashby had tried to vote for a Whig candidate, and his ballot had been rejected as part of a Tory election-rigging scheme. *Id.,* at 156–157.) Regardless, the House of Lords held that Ashby "should recover his damages assessed by the jury" at trial, suggesting that the fact of injury alone did not "import" them. *Ashby* v. *White*, 1 Bro. P. C. 62, 64, 1 Eng. Rep. 417, 418 (1703).

Justice Story is no more helpful to the Court—despite the supposedly "definitive" nature of his statement in *Webb*—as he took the position elsewhere in his writings that a legal

violation alone was *not* sufficient to ground a lawsuit. See Commentaries on the Law of Agency §236, p. 200 (1839) ("[T]he rule applies, that though it is a wrong, it is without any damage; and, to maintain an action, both must concur; for *damnum absque injuria*, and *injuria absque damno*, are equally objections to any recovery."). Perhaps Justice Story's conflicting statements can be reconciled, see *ante,* at 7; Hessick, Standing, Injury in Fact, and Private Rights, 93 Cornell L. Rev. 275, 283, n. 38 (2008), but neither his commentary nor Lord Holt's dissent provides firm footing for the position that a plaintiff could seek nominal damages without alleging actual damages or prospective harm.

At bottom, the Court relies on a handful of indeterminate sources to justify a radical expansion of the judicial power. The Court acknowledges that "the rule allowing nominal damages for a violation of any legal right . . . was not universally followed," *ante,* at 7, but even this concession understates the equivocal nature of the historical record. I would require more before bursting the bounds of Article III.

The Court spends little time trying to reconcile its analysis with modern justiciability principles. It cites in passing our decisions in *Carey* v. *Piphus*, 435 U. S. 247 (1978), *Memphis Community School Dist.* v. *Stachura*, 477 U. S. 299 (1986), and *Farrar* v. *Hobby*, 506 U. S. 103 (1992), but those cases made no mention of Article III, and none involved a standalone claim for nominal damages. The Court also contends that nominal damages must provide redress because courts would otherwise lack jurisdiction to award them, even where a plaintiff tries and fails to prove actual damages. See *ante,* at 10. But a claim for actual damages preserves a live controversy, see *Memphis Light, Gas & Water Div.* v. *Craft*, 436 U. S. 1, 8–9 (1978), and a court does not lose jurisdiction just because that claim ultimately fails.

Finally, the Court argues that nominal damages provide Article III relief because they "affec[t] the behavior of the

defendant towards the plaintiff" by requiring "money changing hands." *Ante,* at 10 (internal quotation marks omitted). If this were the standard, then the prospect of attorney's fees and costs would confer standing at the beginning of a lawsuit and prevent mootness throughout—a proposition we have squarely rejected. See *Lewis* v. *Continental Bank Corp.*, 494 U. S. 472, 480 (1990). The Court posits that "nominal damages are redress," whereas fees and costs "are merely a byproduct of a suit that already succeeded." *Ante,* at 11 (internal quotation marks omitted). This classification just begs the question of what qualifies as redress. To satisfy Article III, redress must alleviate the plaintiff's alleged injury in some way, either by compensating the plaintiff for a past loss or by preventing an ongoing or future harm. Nominal damages do not serve these ends where a plaintiff alleges only a completed violation of his rights. They are not intended to approximate the value of tangible or intangible harms, or the deterrent effect required to prevent future misconduct. And they are not calculated with reference to either of these purposes. Because such an award performs no remedial function—and because "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court," *Steel Co.*, 523 U. S., at 107—nominal damages cannot preserve a live controversy where a case is otherwise moot.

## III

Today's decision risks a major expansion of the judicial role. Until now, we have said that federal courts can review the legality of policies and actions only as a necessary incident to resolving real disputes. Going forward, the Judiciary will be required to perform this function whenever a plaintiff asks for a dollar. For those who want to know if their rights have been violated, the least dangerous branch will become the least expensive source of legal advice.

In an effort to downplay these consequences, the Court

argues that plaintiffs who seek nominal damages will often be able to seek actual damages as well. In this case, for example, the Court notes that Uzuegbunam and Bradford "would have satisfied redressability if instead of one dollar in nominal damages they sought one dollar in compensation for a wasted bus fare to travel to the free speech zone." *Ante,* at 11. Maybe they would have, and maybe they should have. The Court is mistaken, however, to equate a small amount of actual damages with the token award of nominal damages. The former redresses a compensable harm and satisfies Article III, while the latter is a legal fiction with "no existence in point of quantity." J. Mayne, Law of Damages 27 (1856) (internal quotation marks omitted); see Dobbs, Law of Remedies §3.3(2), at 294 ("Nominal damages are damages in name only . . . .").

The Court also insists that not every "request for nominal damages guarantees entry to court." *Ante,* at 11. Yet its holding admits of no limiting principle. As then-Judge McConnell remarked in an insightful concurrence on the issue before us, "[i]t is hard to conceive of a case in which a plaintiff would be unable to append a claim for nominal damages, and thus insulate the case from the possibility of mootness." *Utah Animal Rights Coalition* v. *Salt Lake City Corp.*, 371 F. 3d 1248, 1266 (CA10 2004). The Court today reinforces this point by emphasizing that "*every* violation of a right imports damage," *ante,* at 12 (emphasis added; alterations and internal quotation marks omitted)—even though we have definitively and recently held that a plaintiff must allege a concrete injury even where his rights have been violated, see *Thole* v. *U. S. Bank N. A.*, 590 U. S. ___, ___ (2020) (slip op., at 5) ("This Court has rejected the argument that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" (quoting *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 341 (2016))).

The best that can be said for the Court's sweeping exception to the case-or-controversy requirement is that it may itself admit of a sweeping exception: Where a plaintiff asks only for a dollar, the defendant should be able to end the case by giving him a dollar, without the court needing to pass on the merits of the plaintiff's claims. Although we recently reserved the question whether a defendant can moot a case by depositing the full amount requested by the plaintiff, *Campbell-Ewald Co.* v. *Gomez*, 577 U. S. 153, 166 (2016), our cases have long suggested that he can, see, *e.g., California* v. *San Pablo & Tulare R. Co.*, 149 U. S. 308, 313–314 (1893). The United States agrees, arguing in its brief in "support" of the petitioners that "the defendant should be able to end the litigation without a resolution of the constitutional merits, simply by accepting the entry of judgment for nominal damages against him." Brief for United States as *Amicus Curiae* 29. The defendant can even file an offer of judgment for one dollar, rendering the plaintiff liable for any subsequent costs if he receives only nominal damages. See Fed. Rule Civ. Proc. 68(d). This is a welcome caveat, and it may ultimately save federal courts from issuing reams of advisory opinions. But it also highlights the flimsiness of the Court's view of the separation of powers. The scope of our jurisdiction should not depend on whether the defendant decides to fork over a buck.

\*    \*    \*

Five years after Hamilton wrote Federalist No. 78, Secretary of State Thomas Jefferson sent a letter on behalf of President George Washington to Chief Justice John Jay and the Associate Justices of the Supreme Court, asking for advice about the Nation's rights and obligations regarding the ongoing war in Europe. Washington's request must have struck him as reasonable enough, since English sovereigns regularly sought advice from their courts. Yet the

Justices declined the entreaty, citing "the lines of separation drawn by the Constitution between the three departments of the government." 3 Correspondence and Public Papers of John Jay 488 (H. Johnston ed. 1891). For over two centuries, the Correspondence of the Justices has stood as a reminder that federal courts cannot give answers simply because someone asks.

The Judiciary is authorized "to say what the law is" only because "[t]hose who apply [a] rule to particular cases, must of *necessity* expound and interpret the rule." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803) (emphasis added). Today's decision abandons that principle. When a plaintiff brings a nominal damages claim in the absence of past damages or future harm, it is not "necessary to give an opinion upon a question of law." *San Pablo*, 149 U. S., at 314. It is instead a "gratuitous" exercise of the judicial power, *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26, 38 (1976), and expanding that power encroaches on the political branches and the States. Perhaps defendants will wise up and moot such claims by paying a dollar, but it is difficult to see that outcome as a victory for Article III. Rather than encourage litigants to fight over farthings, I would affirm the judgment of the Court of Appeals.