*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ARTHUR DUCKETT,

Plaintiff-Appellant,

v

MARY C. SOLKY,

Defendant-Appellee.

FOR PUBLICATION
June 2, 2022
9:05 a.m.

No. 357346
Wayne Circuit Court
LC No. 20-008865-NZ

Before: BORRELLO, P.J., and SHAPIRO and HOOD, JJ.

HOOD, J.

Plaintiff Arthur Duckett was involuntarily hospitalized in 2004. In July 2017, Duckett was placed on authorized leave status, which entitled him to live outside of the hospital while receiving outpatient treatment and supervision. Defendant Mary Solky revoked Duckett's leave a few months later without affording him notice of his right to appeal her order. The questions before the Court are whether an involuntarily hospitalized person on authorized leave is entitled to due process of law after revocation of that leave, and if so, the nature and scope of the available remedies.

Michigan's Mental Health Code, MCL 330.1001 *et seq*., mandates that individuals on an authorized leave be afforded notice and an opportunity to appeal an order to return to the hospital. In conjunction with the corresponding Court Rule, MCR 5.743, the statute establishes a protected liberty interest in authorized leave status (ALS). We reverse the circuit court's contrary conclusion and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Duckett's involuntary hospitalization originated with his plea of not guilty by reason of insanity (NGRI) following several stabbings Duckett committed in 2002. The circuit court accepted his plea and committed Duckett to the custody of the Michigan Department of Health and Human Services (MDHHS), Center for Forensic Psychiatry (CFP). The prosecution successfully moved to continue his involuntary hospitalization, thereby transferring jurisdiction from the circuit court to the probate court. Duckett's treatment continued at the Walter P. Reuther

-1-

Psychiatric Hospital (WPRPH), a state hospital operating under the umbrella of MDHHS, where he has been committed since 2006.

From 2004 to 2017, the probate court granted petitions for continuing treatment orders, which continued Duckett's involuntary hospitalization for mental health treatment. As described in Section II, Duckett's continued hospitalization was subject to yearly review.

On July 12, 2017, Duckett was allowed to reside outside of WPRPH under an ALS contract. Under the terms of the contract, Duckett "agreed to comply with a series of conditions . . . for a period of five years in exchange for release from physical confinement in a State-operated psychiatric hospital." A week later, on July 19, 2017, the probate court entered an order for continuing mental health treatment, continuing Duckett's state-supervised treatment while allowing him to live outside of the state hospital.

On September 27, 2017, MDHHS revoked Duckett's ALS contract and reinterned Duckett at WPRPH. Solky concedes that after MDHHS revoked Duckett's ALS contract she did not provide him with notice of his right to appeal his rehospitalization, despite the clear language of MCL 330.1408 and MCR 5.743 requiring her to have done so.

Three and a half months after his return to WPRPH, Duckett filed a petition for discharge from his continuing mental health treatment, challenging a periodic review report's conclusion that he continued to be a person requiring continuing involuntary mental health treatment. In his petition, Duckett requested discharge from involuntary hospitalization. The parties agree that the petition was not an appeal of the decision to revoke his ALS contract.

At a subsequent probate court hearing on Duckett's petition, the court ordered that Duckett's involuntary mental health treatment continue, finding "clear and convincing evidence that [Duckett] has a mental illness and continues to require treatment."

Duckett filed this action under 42 USC § 1983 three months after the probate court hearing. His amended complaint alleges that Solky denied him procedural due process by failing to provide notice of his right to appeal his rehospitalization and to have a hearing.

The amended complaint avers Solky violated MCL 330.1408(3) and MCR 5.743 while acting in both an individual and an official capacity, thereby depriving him of a conditional liberty interest. Duckett's amended complaint analogized his due process right following revocation of authorized leave to the due process right of parolees to challenge revocation of parole, citing *Morrissey v Brewer*, 408 US 471; 92 S Ct 2593; 33 L Ed 2d 484 (1972). The relief requested included compensatory and exemplary damages, an injunction, and attorney fees.

Solky moved for summary disposition under MCR 2.116(C)(7) and (C)(10) in lieu of an answer. Solky argued that the Eleventh Amendment and sovereign immunity barred Duckett's official capacity claims and that Duckett's individual capacity claims were moot given the order for Duckett's continued hospitalization. Solky additionally contended that the probate court hearing on Duckett's petition for discharge afforded Duckett due process, no ongoing illegal practices warranted an injunction, and that Duckett had suffered no harm warranting compensatory or exemplary damages.

Duckett responded that he had a statutory right to contest the revocation of his authorized leave status, and that Solky's failure to provide notice of his opportunity to appeal the revocation, or a hearing, violated due process. Distinct from the statutorily required hearing, Duckett argued that he was entitled to a hearing offering the same procedural protections described in *Morrissey*. The issues were not moot, he insisted, because the probate court had addressed whether he continued to qualify as a person requiring treatment, not whether revocation of his ALS was appropriate. Even absent compensatory damages, he concluded, he could still pursue nominal damages stemming from the denial of his due process rights.

The circuit court granted Solky's motion for summary disposition, first finding that the Eleventh Amendment barred recovery of damages against state officials under 42 USC 1983 "at least where the claim is based on actions taken in the Defendant's official capacity." Further, the court ruled, the probate hearing allowed Duckett to challenge his reinternment with appointed counsel, rendering his request for injunctive relief moot. Duckett now appeals.

## II. AN OVERVIEW OF THE STATUTES GOVERNING INVOLUNTARY COMMITMENT PROCEDURES

We begin by reviewing the statutory framework applicable to involuntary hospitalization and not guilty by reason of insanity pleas before addressing the substance of Duckett's issues on appeal.

### A. THE STATUTORY PROCEDURES REQUIRED FOR INVOLUNTARY HOSPITALIZATION FOLLOWING A FINDING OF NGRI

In Michigan, after a criminal defendant pleads not guilty by reason of insanity or is acquitted by reason of insanity, the trial court must commit the defendant to the custody of the CFP for an initial inpatient diagnostic period not exceeding 60 days. See MCL 330.2050(1). Following this initial diagnostic commitment, CFP is required to provide the trial court, prosecutor, and defense counsel a report and opinion addressing whether the individual qualifies as a "person requiring treatment." See MCL 330.2050(2) (providing the requirements for the report and opinion); see also MCL 330.1401(1) (defining "person requiring treatment" as a person having a mental illness that satisfies at least one of three criteria); MCL 330.1400(g) (defining "mental illness"). If the opinion confirms that the individual is a "person requiring treatment," the trial court may direct the prosecuting attorney to file a petition with the probate court for an order of hospitalization pursuant to MCL 330.1434. See MCL 330.2050(3) and (4).

If the prosecuting attorney files a petition pursuant to MCL 330.1434, a hearing must be "convened promptly, but not more than 7 days after the court's receipt" of "[a] petition for a determination that an individual is a person requiring treatment" MCL 330.1452. Before ordering a person to be involuntarily hospitalized or subject to mental health treatment, a probate court (or jury) must find by clear and convincing evidence that the individual is a "person requiring treatment." MCL 330.1465. If the probate court determines that the individual is a person requiring treatment, it must then enter an initial order of involuntary mental health treatment, limited in duration depending on the type of order entered. MCL 330.1472a(1). "Not less than 14 days before the expiration of an initial" order of involuntary mental health treatment, the hospital director, agency, or mental health professional supervising treatment must file a petition for a

second order of involuntary mental health treatment if the treatment provider believes "the individual continues to be a person requiring treatment" and the individual "is likely to refuse treatment on a voluntary basis when the order expires." MCL 330.1473.

If a petition for a second order of involuntary mental health treatment is filed under MCL 330.1473, a hearing is conducted. MCL 330.1452. If the court finds that the individual continues to be a person requiring treatment, the court must enter a second order of involuntary mental health treatment "that shall not exceed 90 days." MCL 330.1472a(2). Then, "[n]ot less than 14 days before the expiration of" the second order of involuntary mental health treatment, a petition for a continuing order of involuntary mental health treatment must be filed. MCL 330.1473. And upon receipt of a petition for a continuing order of involuntary mental health treatment, a hearing under MCL 330.1452(1)(b), and a finding that the individual continues to be a person requiring treatment, the probate court must issue a continuing order for involuntary mental health treatment "that shall not exceed 1 year." MCL 330.1472a(3).

An order to continue involuntary hospitalization is, thus, limited to a one-year duration. *Id.* But if petitions for continuing orders for mental health treatment continue to be filed under MCL 330.1473 and the probate court continues to find that the individual qualifies as a person requiring treatment, continuing orders for involuntary hospitalization may be reissued every year. MCL 330.1472a(4).

In addition to this annual review, every patient subject to a one-year continuing hospitalization order must receive a psychological reevaluation six months after entry of the one-year order. See MCL 330.1482. The psychological reevaluation is performed to determine whether the individual continues to qualify as a person requiring treatment. *Id.* The results of the psychological evaluation are "made part of the individual's record" and filed with the court "in the form of a written report" within five days of the evaluation. See MCL 330.1483(1). "[W]ithin those [five] days," the hospital director must give the patient notice of the results of the evaluation, as well as information "on the individual's right to petition for discharge to," in relevant part, the individual and the individual's attorney. See *id.* If the report issued pursuant to MCL 330.1483 concludes that the patient requires continuing involuntary mental health treatment and "the individual or executive director objects to the conclusions, the individual or the executive director has the right to a hearing and may petition the court for discharge of the individual from the treatment program." MCL 330.1484. The petition must be "presented to the court within 7 days, excluding Sundays and holidays, after the report is received." Additionally, the probate court must hold a hearing on a petition for discharge filed under MCL 330.1484, and issue an appropriate order. See MCL 330.1452; MCL 330.1484; MCL 330.1485a.

## B.    AUTHORIZED LEAVE STATUS

NGRI patients under a hospitalization treatment order are not necessarily physically confined in a psychiatric hospital. A patient may be approved for leaves or absences from the hospital in accordance with established rules and procedures. See MCL 330.1479. Before being placed on leave, however, the CFP must evaluate and recommend a patient for leave. See MCL 330.2050(5); see also MCL 330.1128 (requiring MDHHS to maintain the CFP as an entity under MDHHS's jurisdiction). NGRI patients are allowed to reside outside the psychiatric hospital and in the community under an ALS contract.

A patient's failure to comply with the terms of the ALS contract can result in revocation of authorized leave status and subsequent rehospitalization. Noncompliance warranting rehospitalization is not necessarily tied to misconduct but can include, among other things, failing to take medication, failing to maintain sobriety, or leaving the state without permission.

If a patient under an ALS contract is returned to the hospital, MCL 330.1408 and MCR 5.743 govern that individual's right to appeal his or her rehospitalization. MCL 330.1408 provides in relevant part:

> (1) An individual is subject to being returned to a hospital if both of the following circumstances exist:
>
> (a) The individual was admitted to the hospital by judicial order.
>
> (b) The individual has left the hospital without authorization, or has refused a lawful request to return to the hospital while on an authorized leave or other authorized absence from the hospital.
>
> * * *
>
> (3) An opportunity for appeal, and notice of that opportunity, shall be provided to an individual who objects to being returned from any authorized leave in excess of 10 days. [MCL 330.1408(1) and (3).]

A corresponding Court Rule, MCR 5.743(B), establishes specific procedures that must be followed when an individual on authorized leave is returned to the hospital. The hospital director "must, within 24 hours, notify the court of the return and notify the individual of the right to appeal the return and have a hearing to determine the appeal." The probate court must then "notify the individual's attorney or appoint a new attorney to consult with the individual and determine whether the individual desires a hearing." MCR 5.743(B).

An appeal of a rehospitalization order must be filed within seven days, and a hearing must be scheduled to occur within seven days of receipt of the individual's request for an appeal. MCR 5.743(C). At the hearing, the hospital director must show that "the individual requires treatment in the hospital." MCR 5.743(E). If the probate court finds that the "individual requires treatment at a hospital, it must dismiss the appeal and order the individual returned to the hospital." MCR 5.743(F). But if the probate court finds that the hospital director "lacked an adequate basis for concluding that the individual requires further treatment in the hospital," the probate court must either order the individual returned to authorized leave status or order treatment through an alternative to hospitalization. *Id.* Thus, at its outer limits, the probate court hearing must occur no later than 15 days after ALS revocation.[1]

---

[1] This 15-day calculation is based on the 24-hour notice that must be given to the individual and the court after rehospitalization, the seven days within which the individual must request a hearing,

We turn to the question of whether the Mental Health Code endows Duckett with a liberty interest related to the revocation of authorized leave during an involuntary hospitalization subject to due process protections.

### III. DUCKETT'S DUE PROCESS CLAIM

Duckett first contends that Solky violated his right to due process of law by revoking his ALS without notice of his right to appeal. We review this legal question de novo. *Sandstone Creek Solar, LLC v Benton Twp*, 335 Mich App 683, 712; 967 NW2d 890 (2021) (citation omitted). We also review de novo a trial court's interpretation and application of statutes and court rules. *Id*. at 698, 712 (citations omitted).

### A. LEGAL STANDARD FOR DUE PROCESS

The Fourteenth Amendment prohibits the State from depriving a person of life, liberty, or property without due process of law, and protects against the arbitrary action of the government. See US Const, Am XIV; *Kentucky Dep't of Corrections v Thompson*, 490 US 454, 459-460; 109 S Ct 1904; 104 L Ed 2d 506 (1989). Courts examine procedural due process questions in two steps: first, we ask whether the State has interfered with a protected liberty or property interest; second, we inquire whether the procedures leading to the deprivation of that interest were constitutionally sufficient. *Thompson*, 490 US at 460. Regarding the first question, the "liberty" and "property" interests for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than "an abstract need or desire," *Bd of Regents of State Colleges v Roth*, 408 US 564, 577; 92 S Ct 2701; 33 L 3d 2d 548 (1972), and must be based on more than "a unilateral hope," *Connecticut Bd of Pardons v Dumschat*, 452 US 458, 465; 101 S Ct 2460; 69 L Ed 2d 158 (1981). Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it. *Thompson*, 490 US at 460.

Regarding the second question, the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *In re KB*, 221 Mich App 414, 419; 562 NW2d 208 (1997). To determine what due process requires in a particular situation, the court must consider three factors:

> (1) the interest that will be affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value that additional or substitute safeguards would have; and (3) the government's interest, including the function involved as well as the fiscal and administrative burdens that the additional or substitute procedures would require. [*Id.*, citing *Dobrzenski v Dobrzenski*, 208 Mich App 514, 515; 528 NW2d 827 (1995), and *In re Attorney Fees of Jacobs*, 185 Mich App 642, 645; 463 NW2d 171 (1990).]

---

and the seven days within which the court must schedule and hold a hearing after receiving the individual's request for a hearing. MCR 5.743(B) and (C).

## B. DUE PROCESS PROTECTS AN INVOLUNTARILY HOSPITALIZED PERSON'S LIBERTY INTEREST IN AUTHORIZED LEAVE STATUS

The first inquiry in analyzing an alleged due process violation is whether the individual has a liberty interest subject to due process protections. See *Thompson*, 490 US at 460. In accord with binding case law, the parties do not dispute that an involuntarily hospitalized person has a liberty interest tied to authorized leave.

Involuntary confinement for the treatment of mental illness is a "massive curtailment of liberty." *Humphrey v Cady*, 405 US 504, 509; 92 S Ct 1048; 31 L Ed 2d 394 (1972). "There can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law." *O'Connor v Donaldson*, 422 US 563, 580; 95 S Ct 2486; 45 L Ed 2d 396 (1974) (Burger, C.J., concurring). And "it appears settled that the revocation of a conditional release from hospitalization involves a liberty interest that should be afforded due process." *In re KB*, 221 Mich App at 419 (citations omitted). Accordingly, Duckett's authorized leave status was a conditional release from hospitalization and therefore entitled to due process protections.

We next consider the procedures necessary to satisfy due process, and whether the procedure in place meet due process standards. See *Morrissey*, 408 US at 481. Due process is flexible and calls for such procedural protections as the particular situation demands. *Id*. Fundamentally, "[d]ue process requires that a party receive notice of the proceedings against it and a meaningful opportunity to be heard." *Sandstone Creek Solar, LLC*, 335 Mich App at 712, citing *Bonner v Brighton*, 495 Mich 209, 235; 848 NW2d 380 (2014).

Here, the procedures in place satisfied due process requirements. By mandating notice and an expeditious opportunity to appeal, the statute and the Court Rule mitigate the risk of an erroneous deprivation of liberty by allowing for a prompt appeal of the decision to revoke ALS, appointing counsel, and holding a hearing before the probate court. The court must notify the person's attorney or appoint a new attorney, MCR 5.743(B), and the Court Rule further requires the hospital director to provide the individual and his attorney with copies of a clinical certificate and alternative treatment report three days before the hearing, MCR 5.743(D). These safeguards ensure that an appeal is meaningful. The procedures also accommodate the government's interest in avoiding unnecessary hearings by appointing counsel to assist with an appeal. This procedure not only protects the patient's rights, it also provides some safeguard against frivolous appeals by vetting them through the advice of counsel. If followed, these procedures permit a prompt, fulsome hearing with the assistance and advice of counsel, without overly burdening the government or fisc. Accordingly, MCL 330.1408 and MCR 5.743 satisfy due process.

When Solky revoked Duckett's authorized leave status and reinterned him at the hospital, Solky and CFP did not follow the procedures in MCL 330.1408 and MCR 5.743. Contrary to the requirements of MCL 330.1408(3) and MCR 5.743, Solky failed to notify Duckett of his right to appeal the return and to have a hearing within seven days. Solky never notified the probate court of Duckett's reinternment, depriving the court of the opportunity to appoint counsel for Duckett. Solky's failure to provide Duckett notice of the opportunity to appeal his rehospitalization, and for a hearing, violated his due process rights.

We reject Solky's argument that the probate hearing remedied the due process violation for two reasons. First, the hearing addressed a different question than would an appeal of an ALS revocation. The issue at the probate hearing was whether Duckett required involuntary mental

health treatment at that time, not whether Duckett could continue to receive his involuntary mental health treatment outside of a hospital setting. Second, even if we accept that the issues at these two types of hearings are effectively the same—which they are not—the hearings addressed Duckett's mental health at different times. An appeal of the ALS revocation would have focused on Duckett's mental health condition on September 27, 2017. The hearing conducted on his petition for release inquired into his mental health on April 13, 2018, six and a half months later.

The statutorily-required deadlines and reviews reflect that mental health is dynamic, particularly for those who suffer from severe mental health conditions. Duckett's treatment needs on September 27, 2017 may have been very different from those displayed at the later hearing. The procedures contained in MCL 330.1408 and MCR 5.743 satisfy due process, in part, because the tight timeframe for appeal guards against erroneous deprivation of the liberty interest tied to ALS. The delayed hearing did not offer the same protection. And it does not remedy the due process violation that resulted from Solky's failure to provide notice of Duckett's right to appeal, to consult with counsel, and have a hearing.

C.  *MORRISEY V BREWER* DOES NOT APPLY TO AUTHORIZED LEAVE FOR INVOLUNTARILY HOSPITALIZED PERSONS

In *Morrissey*, the United States Supreme Court held that a hearing must be held for the parolee before revocation of parole. *Morrissey*, 408 US at 482-484. "The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Id*. at 477. "[T]he liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others." *Id*. at 482. The *Morrissey* Court concluded that a parolee's liberty "is valuable and must be seen as within the protection of the Fourteenth Amendment," so "[i]ts termination calls for some orderly process, however informal." *Id*. The Court also described the typical conditions of parole:

> To accomplish the purpose of parole, those who are allowed to leave prison early are subjected to specified conditions for the duration of their terms. These conditions restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen. Typically, parolees are forbidden to use liquor or to have associations or correspondence with certain categories of undesirable persons. Typically, also they must seek permission from their parole officers before engaging in specified activities, such as changing employment or living quarters, marrying, acquiring or operating a motor vehicle, traveling outside the community, and incurring substantial indebtedness. Additionally, parolees must regularly report to the parole officer to whom they are assigned and sometimes they must make periodic written reports of their activities. [*Id*. at 478.]

These conditions, although restrictive on a parolee's freedom, constitute an implicit promise "that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole." *Morrissey*, 408 US at 479. The *Morrissey* Court held that when a state intends to revoke parole, it must provide a hearing that, although the procedure may be informal,

must include the following minimum requirements of due process for parole revocation proceedings:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole. [*Id*. at 489.]

Here, the question is whether the liberty interest tied to authorized leave from involuntary hospitalization is sufficiently similar to the liberty interest associated with parole such that *Morrissey*'s procedural requirements apply. We hold that it is not.

Admittedly, there are some similarities between parole and administrative leave. The *Morrissey* Court described some typical conditions of parole, including restrictions on the parolee's use of alcohol, and the need to seek permission from a parole officer to engage in certain activities such as "changing employment or living quarters" and "traveling outside the community." *Morrissey*, 408 US at 478. Similar conditions exist in ALS contracts. For example, the sample ALS contract submitted by Duckett requires a patient on administrative leave to maintain sobriety, remain in the state unless permitted to leave, and to obtain approval before any change of address or placement. Like a parolee, an individual on authorized leave can lead a relatively normal life, subject to the conditions of the release. These similarities do not, however, justify extending the protections of *Morrissey* in light of the differences between administrative leave and parole.

The primary difference is that the purpose of involuntary hospitalization is treatment, not punishment. *Rouse v Cameron*, 125 US App DC 366, 367; 373 F2d 451 (1966).[2] Second, administrative leave is a "therapeutic device in a program of medical treatment of a mentally ill person" that has no penal or deterrent aspects. See *Dietrich v Brooks*, 27 Or App 821, 825; 558 P2d 357, 360 (1976). Imprisonment and parole, on the other hand, serve "penal and deterrent" functions. *Id*. Thus, "the basic purposes and societal expectations of each are fundamentally different." *Id*. Third and most importantly, the natures of the revocation of administrative leave and revocation of parole are different. Revocation of parole results from a "willful and knowing violation of a condition or conditions imposed upon one previously convicted of having violated the criminal law," while a decision regarding hospitalization or reinternment stems exclusively from medical necessity:

> [T]his case is fundamentally different from those involving revocation of probation or parole. In the latter, revocation is based upon a finding that there has been a willful and knowing violation of a condition or conditions imposed upon one

---

[2] "Caselaw from sister states and federal courts is not binding precedent but may be relied on for its persuasive value." *Haydaw v Farm Bureau Ins Co*, 332 Mich App 719, 727 n 5; 957 NW2d 858 (2020).

previously convicted of having violated the criminal law. These people, at least presumably, are sane and their acts are the result of their own volition. They are not persons suffering from a condition or disease which requires continuing medical treatment.

In the case of mental patients, even more than in the case of patients suffering from physical ailments, a decision as to whether to keep the patient in the hospital or to discharge him must remain a medical one, to be decided by medical experts, based upon the mental condition of the patient and the necessity for hospital treatment, as determined by them. [ *Hooks v Jaquith*, 318 So 2d 860, 861 (Miss, 1975).]

Here, the revocation of Duckett's administrative leave was tied exclusively to his treatment needs, even if the source of the revocation was misconduct.[3] See MCL 330.1408(1) (subjecting individual to rehospitalization if individual was "admitted to the hospital by judicial order" and either "left the hospital without authorization" or "refused a lawful request to return to the hospital while on an authorized leave or other authorized absence from the hospital."); MCR 5.743(E) (requiring showing at the hearing that the individual requires treatment in a hospital); MCR 5.743(F) (requiring either dismissal of appeal and entry of order for rehospitalization if individual requires treatment at a hospital, or, if no adequate basis for finding further treatment in hospital required, an order returning the individual to authorized leave status or ordering treatment through alternative to hospitalization). The revocation in *Morrissey*, on the other hand, was solely a sanction for alleged misconduct. See *Morrissey*, 408 US at 472-473. The process for evaluating whether revocation was proper also differs between parole and administrative leave. The *Morrissey* Court explained that a two-step analysis was necessary: whether the alleged misconduct actually happened and, if so, whether revocation was the proper sanction. *Morrissey*, 408 US at 487-488. Here, MCL 330.1408 and MCR 5.743 direct the probate court to answer a single question: is hospitalization required? See MCL 330.1408(1); MCR 5.743(E) and (F). These differences between parole and administrative leave for mental health patients compel the conclusion that *Morrissey* is inapplicable.

In sum, *Morrissey* does not apply and a hearing related to the revocation of a patient's administrative leave, like Duckett's ALS contract, need not include the specific protections articulated by the *Morrissey* Court. The provisions of MCL 330.1408 and MCR 5.743 satisfy due process. Despite that *Morrissey* does not apply, however, Duckett has an actionable due process claim under 42 USC § 1983 for the reasons discussed above. We turn to Duckett's remedies.

---

[3] The record is silent on what triggered Duckett's revocation. There is no evidence indicating *why* his ALS contract was revoked, but the sample ALS contract that Duckett submitted with his brief indicates that it could be revoked for noncompliance with its provisions. Because the probate court's inquiry on an appeal following revocation is whether hospitalization is necessary, the underlying reason is less important than at a parole revocation hearing.

## IV.    DUCKETT'S REMEDIES

## A.    GENERAL LEGAL PRINCIPLES

Duckett's amended complaint seeks damages against Solky in both her individual and official capacities, and an injunction.  We hold that damages are available for the individual capacity suit only, and that injunctive relief is precluded on immunity grounds.

Neither states nor state officials acting in an *official* capacity may be sued under 42 USC 1983.  *Will v Michigan Dep't of State Police*, 491 US 58; 109 S Ct 2304; 105 L Ed 2d 45 (1989), affirming *Smith v Dep't of Public Health*, 428 Mich 540, 544; 410 NW2d 749 (1987); *Thomas v McGinnis*, 239 Mich App 636, 643 n 6; 609 NW2d 222 (2000).  The Eleventh Amendment bars such suits unless the State has waived its immunity, or unless Congress has exercised its power to override that immunity.  *Will*, 491 US at 66.  But a lawsuit for money damages against a public official in his or her individual capacity is not precluded.  *Thomas*, 239 Mich App at 643 n 6, citing *Goodmon v Rockefeller*, 947 F2d 1186, 1187 (CA 4, 1991).

Thus, Duckett's claim for money damages against Solky in her individual capacity is not precluded under § 1983.  *Thomas*, 239 Mich App at 643 n 6.  To the extent the circuit court concluded otherwise, the circuit court erred. Damages against Solky in her official capacity, however, are barred.  See *Will*, 491 US at 58; *Thomas*, 239 Mich App at 643 n 6.

Sovereign immunity also bars Duckett's claim for prospective injunctive relief in light of *Ex Parte Young*, 209 US 123; 28 S Ct 441; 52 L Ed 714 (1908).  Our Supreme Court has described the central holding in *Young* as follows:

> *Ex parte Young, supra,* helped to lay the groundwork for the Supreme Court's development of the concept of official-versus personal-capacity suits. In *Young,* the Court carved out an exception to the Eleventh Amendment's prohibition against suing a state in federal court. …  The Supreme Court, … found that the Eleventh Amendment did not preclude official-capacity suits for injunctive relief because such suits "stripped" an official of his "official or representative character," thus exposing only the *individual* occupying the office to liability. [*Smith v Dept of Pub Health*, 428 Mich 540, 583, 585; 410 NW2d 749 (1987)

*Ex Parte Young* applies, however, only when a complaint "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Ladd v Marchbanks*, 971 F3d 574, 581 (CA 6, 2020) (quotation marks and citation omitted).  " 'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.' "  *Los Angeles v Lyons*, 461 US 95; 103 S Ct 1660; 75 L Ed 2d 675 (1983), quoting *O'Shea v Littleton*, 414 US 488, 495-496; 94 S Ct 669; 38 L Ed 2d 674 (1974).  Courts should assume that, absent an official policy or practice encouraging unconstitutional behavior, individual government officials will act constitutionally.  *Lyons*, 461 US at 102-103; *O'Shea*, 414 US at 495-496.

Duckett has not shown an ongoing violation of federal law.  The allegations in Duckett's complaint center on past violations and do not describe any future risk of harm. Duckett also fails

to allege the existence of an official policy or practice, and does not suggest that the alleged conduct is likely to occur again. Absent such allegations, this Court assumes that Solky will act to avoid future constitutional violations. *Lyons*, 461 US at 102-103; *O'Shea*, 414 US at 495-496. The possibility that Duckett will again be deprived of procedural due process is too speculative to justify injunctive relief or to deem the alleged activity an ongoing violation of federal law.

## B.    THE NATURE OF THE DAMAGES TO WHICH DUCKETT IS ENTITLED

We first consider whether Duckett's damages claim is moot given that he remains hospitalized. This Court generally does not address moot questions or declare legal principles that have no practical effect in a case. *Adams*, ___ Mich App at ___; slip op at 4 (citation omitted). An issue is rendered moot when "an event has occurred that renders it impossible for the court to grant relief. An issue is also moot when a judgment, if entered, cannot for any reason have a practical legal effect on the existing controversy." *Id*. (quotation marks and citation omitted). We may, however, review moot issues if they are "publicly significant, likely to recur, and yet likely to evade judicial review." *Id*. (quotation marks and citation omitted).

The mootness doctrine does not bar Duckett's claim for nominal damages. The federal courts have held that a violation of one's procedural due process rights is actionable for nominal damages, even absent proof of actual injury. *Carey v Piphus*, 435 US 247, 266; 98 S Ct 1042; 55 L Ed 2d 252 (1978); *Uzuegbunam v Preczewski*, ___ US ___, ___; 141 S Ct 792, 796, 800; 209 L Ed 2d 94 (2021); see also *Franklin v Aycock*, 795 F2d 1253, 1264-1265 (CA 6, 1986) (explaining that if a plaintiff shows that his procedural due process rights were violated but the defendant disproves causation, the plaintiff is still entitled to nominal damages). Additionally, a claim for nominal damages may generally "go forward in an otherwise-moot case . . . ." *Morrison v Bd of Ed of Boyd Co*, 521 F3d 602, 611 (CA 6, 2008) (citations omitted); see also *Ermold v Davis*, 855 F3d 715, 719 (CA 6, 2017) ("Claims for damages are largely able to avoid mootness challenges."). We adopt these holdings.

Duckett had a due process right to notice of the opportunity to appeal his return to the hospital, and for a hearing. Accordingly, Duckett is entitled to nominal damages and his claim for damages against Solky in her individual capacity is not moot. *Carey*, 435 US at 266; *Uzuegbunam*, ___ US at ___; 141 S Ct at 796, 800.

Solky's objection to a nominal damage award rests on her assertion that Duckett did not specifically request nominal damages in his amended complaint. Although Duckett's amended complaint does not use the term "nominal damages," he included a catchall provision requesting "such other further relief as this Court deems just and efficient under the circumstances of this case." This catchall provision sufficiently requests an award of nominal damages, and such an award may be justified by the circumstances of this case. Additionally, Duckett is entitled to amend his complaint to specifically allege a claim for nominal damages should he choose to do so. See MCR 2.116(I)(5).

Solky next contends that even if Duckett is entitled to nominal damages for a "technical violation of the due-process clause" and his claim not moot, remanding would be an "improper waste of judicial resources" on "such grounds." None of the cases on which Solky relies involve nominal damages in the context of a due process violation. To deny Duckett the possibility of

nominal damages is to leave unredressed Solky's failure to follow clearly delineated statutory requirements for individuals on authorized leave who are returned to the hospital. Judicial resource are not "wasted" in fashioning a nominal form of relief.

## V.  CONCLUSION

Duckett established a procedural due process violation justifying relief under 42 USC § 1982, and the circuit court erred by summarily dismissing this claim.  We remand for the circuit court to allow Duckett to pursue a claim for nominal damages and for attorney fees. We do not retain jurisdiction.

/s/ Noah P. Hood
/s/ Stephen L. Borrello
/s/ Douglas B. Shapiro